T.C. Memo. 2011-36

UNITED STATES TAX COURT

WB ACQUISITION, INC. & SUBSIDIARY, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 26187-06, 29106-07,    Filed February 8, 2011.
              5039-08.

Ernest S. Ryder, Richard V. Vermazen, Lauren A. Rinsky, and

John W. Sunnen, for petitioners.

Monica D. Gingras and Mistala G. Merchant, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HAINES, Judge:  These cases are before the Court

consolidated for purposes of trial, briefing, and opinion.  WB

---

[1]Cases of the following petitioners are consolidated
herewith:  WB Partners f.k.a. WB Acquisition Partners, DJB
Holding Corporation, Tax Matters Partner, docket No. 29106-07;
and WB Acquisition, Inc., docket No. 5039-08.

Acquisition, Inc., & Subsidiary petitioned the Court for
redetermination of the following Federal income tax deficiencies
and penalties:

|          |            | Penalty   |
| Year     | Deficiency | Sec. 6662 |
|----------|------------|-----------|
| 2002     | $987,222   | $197,444  |
| 2003     | 3,543,011  | 708,602   |
| 2004     | 226,162    | 45,232    |
| 2005     | 131,302    | 26,260    |

The tax matters partner of WB Partners separately petitioned the
Court for readjustment of final partnership administrative
adjustments with respect to 2003, 2004, and 2005.  WB
Acquisition, Inc., and Watkins Contracting, Inc., filed
consolidated tax returns for taxable years 2002-2005.

The issues for decision after concessions[2] are:

1.   Whether Watkins Contracting, Inc., and WB Partners
conducted the environmental remediation of the San Diego Naval
Training Center as a joint venture for Federal tax purposes
during taxable years 2002-2004;

2.   whether the proceeds of a covenant not to compete and
interest income resulting from the 2003 sale of Watkins

---

[2]On brief respondent conceded that:  (1) A refund check for
$326,574 erroneously issued by respondent to Watkins Contracting,
Inc., was returned and does not constitute income to Watkins
Contracting, Inc., in 2005; (2) WB Partners, DJB Holding
Corporation, GSW Holding Corporation, the DJB Holding Corporation
ESOP, and the GSW Holding Corporation ESOP are not shams for tax
purposes; (3) DJB Holding Corporation and GSW Holding Corporation
are the true partners of WB Partners; and (4) petitioners have
substantiated the net operating loss (NOL) of $563,485 of Watkins
Contracting, Inc., generated in 2000 and used in 2002 and 2003.

Contracting, Inc.'s assets were properly included in the income of WB Partners in 2003 and 2004;

3.   whether an NOL claimed by Watkins Contracting, Inc., as a carryforward from 2001 to 2003 was substantiated; and

4.   whether WB Acquisition, Inc., & Subsidiary are liable for section 6662(a) penalties.[3]

FINDINGS OF FACT

I.   <u>History of WCI</u>

Daren J. Barone (Barone) and Gregory S. Watkins (Watkins) began their careers in the business of specialty contracting, environmental remediation, and demolition in Hawaii in the early 1980s.  Soon after, they expanded into the asbestos removal trade.  In the early 1990s, Barone and Watkins returned to their hometown of San Diego, where Watkins worked for his father's company, Watkins & Son, a business specializing in asbestos removal.  In late 1991 or early 1992 Barone joined Watkins & Son as an employee.  Together with Watkins' father, Barone and Watkins ran the company until Watkins' father retired in the mid-1990s.  Barone and Watkins subsequently purchased Watkins' father's interest in the company and renamed it Watkins Contracting, Inc. (WCI).

---

[3]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure. Amounts are rounded to the nearest dollar.

Barone and Watkins operated WCI until 1997, when they sold the stock of the company to REXX Environmental Corp. (REXX) for cash and stock. Barone testified that he encouraged Watkins to sell WCI in part because of the personal liability associated with the business, which required Barone and Watkins to obtain performance bonds and sign indemnity agreements to guarantee the completion of certain projects. The sale relieved Barone and Watkins from any such personal guaranties.

In connection with the sale, REXX hired Barone and Watkins as employees to manage WCI. Under REXX, Barone managed employees and accounts, handled financing, and developed business. Similarly, Watkins bid jobs, managed construction, and oversaw field work.

By 1999 REXX encountered financial difficulties in its operation of WCI. These financial difficulties significantly impaired WCI's ability to bond future projects. REXX's executives refused to execute personal indemnities and guaranties for WCI to bond its projects and began looking to sell the company. Under these circumstances, REXX's executives turned to Barone and Watkins to sign personal guaranties for WCI to bond projects. In exchange for their personal guaranties, REXX offered Barone and Watkins a percentage of profits from WCI projects.

During this time a profitable opportunity arose for WCI to perform remediation work for the U.S. Navy in San Diego in a job known as the IDIQ project. Because of WCI's financial position, however, REXX was unable to secure the bonding on the IDIQ project without personal guaranties for the completion of the project. Consequently, an agreement was reached with REXX for Barone and Watkins to personally guarantee the bond for the IDIQ project. In exchange for their personal guaranties, the agreement entitled Barone and Watkins to 66.66 percent of the profits from the IDIQ project.

As WCI's financial problems mounted, REXX became more eager to sell the company and approached Barone and Watkins to gauge their interest in reacquiring WCI. Barone and Watkins initially were hesitant about a potential deal because they were concerned with a number of liability issues surrounding WCI. Nonetheless, Barone and Watkins eventually offered to purchase the stock of WCI for approximately one-third of the price they had received for it just 2 years earlier. As a condition of their offer, Barone and Watkins required the sale to be structured in a way that would limit their personal exposure.

To address this concern, Barone met with Ernest S. Ryder (Ryder), an attorney, to discuss asset protection vehicles for the purchase and subsequent ownership of WCI. Barone and Watkins had a laundry list of concerns they wanted to address before

moving forward, including: (1) Personal protection from creditors; (2) layers of liability protection to operate WCI; (3) the ability to invest both together and separately, depending on the risks involved in each project; (4) creating qualified retirement plans; and (5) avoiding probate. Barone and Watkins ultimately contracted the services of Ryder to design a structure to meet their concerns.

The structure designed by Ryder began with forming a corporate owner of WCI, WB Acquisitions, Inc. (Acquisitions). Acquisitions is a C corporation wholly owned by a partnership, WB Partners. The partnership had two equal S corporation partners, DJB Holding Corporation (DJB) and GSW Holding Corporation (GSW). DJB and GSW are wholly owned by the DJB Holding Corporation ESOP (DJB ESOP) and the GSW Holding Corporation ESOP (GSW ESOP), respectively, each of which is an employee stock ownership plan. Barone is the lone participant in the DJB ESOP, and Watkins is the lone participant in the GSW ESOP. This structure is reflected in the following diagram:

## Barone & Watkins Entities



This structure addressed each of Barone's and Watkins' concerns. Acquisitions served as a corporate owner of WCI to protect Barone and Watkins from the risks of personal liability. WB Partners was a vehicle that allowed Barone and Watkins to invest together on projects unrelated to the environmental remediation and construction work performed by WCI.[4] DJB and GSW were corporate vehicles which allowed Barone and Watkins to invest individually[5] and added another layer of protection from personal liability. Finally, the DJB ESOP and the GSW ESOP provided Barone and Watkins with qualified retirement plans. On June 10, 1999, Barone and Watkins finalized the purchase of the stock of WCI from REXX, and on September 19, 2000, Barone and Watkins assigned their ownership interests in WCI to Acquisitions.

II. The Services of Barone and Watkins

In connection with the purchase from REXX and with the formation of the above-described structure, Barone and Watkins entered into employment agreements with their respective corporations, DJB and GSW, to provide construction management, indemnity, and financing services full time. Several relevant

---

[4]Since its formation, WB Partners has invested in at least 20 business ventures, including investments in a publishing company, a medical center, a hotel in Florida, condominiums in Las Vegas, and other properties in California.

[5]At trial, Barone testified that he was more willing to take risks and that DJB allowed him to make investments that Watkins could not stomach.

provisions describe Barone's and Watkins' responsibilities pursuant to their employment agreements. Section 1.1.4 of each employment agreement provides for the services of Barone and Watkins to include any and all services related to the present or future business of DJB, GSW, WCI, any related entity, and any party that may acquire an interest in any of the above-listed entities. Section 1.3 of each employment agreement is a noncompetition provision, preventing Barone and Watkins from engaging in any business activity which is, or could become, competitive with or adverse to any of the above-listed entities. Finally, section 2.2 of each employment agreement requires Barone and Watkins to provide their services exclusively for the benefit of DJB and GSW.

DJB and GSW each hold a 50-percent partnership interest in WB Partners. Pursuant to section 1.6 of the WB Partners partnership agreement, which provides that DJB and GSW controlled the exclusive rights to the services of Barone and Watkins, the S corporations contributed such services to the partnership as necessary to manage and conduct its business.

Despite the exclusivity clauses of their employment agreements, Barone and Watkins performed services for WCI without the permission of DJB, GSW, or WB Partners. Barone testified that he continued to perform the same services he had performed for WCI while it was controlled by REXX after Barone and Watkins

repurchased the stock of WCI. Those services included managing employees and accounts, handling financing, and developing business. Further, Watkins testified that he "bid and got and oversaw" nearly three-quarters of WCI's projects.

III. The NTC Joint Venture

A. The NTC Project

In late 1999 or early 2000, the city of San Diego solicited bids for a redevelopment project at the San Diego Naval Training Center (the NTC project). This project required extensive environmental remediation work, including the removal of asbestos, lead-based paint, and contaminated soil from close to 200 buildings. The city of San Diego ultimately chose the Corky McMillin Cos. (McMillin) as the master developer of the project. McMillin then hired the Harper-Nielsen-Dillingham Joint Venture (Harper) as the construction manager to oversee the demolition and remediation of the NTC project. Harper does not perform this type of work on its own, however, so on September 29, 2000, Harper entered into an agreement with WCI for the performance of the demolition and environmental remediation work of the NTC project (the subcontract agreement). Pursuant to the subcontract agreement, WCI was to receive $17,001,073.

WCI's willingness to undertake the demolition and remediation work of the NTC project came with risk. The NTC project required the demolition of and removal of all hazardous

materials from close to 200 buildings covering a space approximately 1 mile long and three-quarters of a mile wide. To secure the subcontract agreement, McMillin and Harper required WCI to submit a lump-sum bid. A lump-sum bid would force WCI to take on the risk of unexpected costs, a risk that was prevalent in the NTC project because no clearly defined scope of work was provided to Harper and WCI during the bidding process. WCI reviewed prints and conducted an investigation of the NTC project site before bidding. Nonetheless, the project posed significant construction and environmental risks, including unknown amounts of asbestos, lead-based paints, and other items.

As part of the bidding process for the NTC project, the city of San Diego required a developer to put up a bond and sign an indemnity agreement to guaranty completion of the job. Both McMillin and Harper refused to guarantee the work, forcing WCI to assume the risk as part of its subcontract bid. Both Barone and Watkins testified that signing a $17 million bond was scary; it was far and away the largest personal guaranty they had ever contemplated. Barone and Watkins were specifically concerned that with WCI's financial difficulties under REXX, creditors from other projects might be able to reach the cashflow of the NTC project. Accordingly, each testified that taking on that kind of risk required taking steps to make sure the cashflow from the NTC project was protected.

B.    The NTC Joint Venture Agreement

To address their concerns Barone decided that WCI would participate in the NTC project through a joint venture.  On September 20, 2000, WCI and WB Partners executed an agreement (the NTC joint venture agreement) to form a joint venture for the purpose of completing the NTC project (the NTC joint venture). Pursuant to section 4.4 of the NTC joint venture agreement, 30 percent of the profits from the NTC joint venture were allocated to WCI and 70 percent to WB Partners.  The ownership structure of the NTC joint venture is reflected in the following diagram:

## The NTC joint venture



Section 2.1.1 of the NTC joint venture agreement describes the obligations of WCI in the NTC joint venture, providing:

> 2.1.2 <u>Obligations and Responsibilities of WCI</u>. The proposal shall provide that WCI shall have responsibility for management and performance of the Subcontract Work in connection with the Project, with full authority to make decisions regarding the performance of said Subcontract work.

Similarly, section 2.1.2 of the NTC joint venture agreement describes the obligations and responsibilities of WB Partners in the NTC joint venture, providing:

> 2.1.2 <u>Obligations and Responsibilities of WB</u>. The proposal shall provide that WB shall have responsibility for providing Indemnity and Financing Services to WCI so that WCI has the financial capability to perform the Subcontract work.

Section 3.1 of the NTC joint venture agreement further provides that WB Partners agrees to assist WCI with any additional information and data reasonably required throughout the proposal process.

Several other provisions of the NTC joint venture agreement are relevant to our discussion. As discussed above, section 4.4 of the NTC joint venture agreement allocates 30 percent of the profits from the NTC joint venture to WCI and 70 percent to WB Partners. According to Barone and Watkins, this profit split was based on their agreement with REXX for the IDIQ project. Because REXX paid Barone and Watkins 66.66 percent of the profits from the IDIQ project in an arm's-length transaction, Barone and Watkins reasoned WB Partners was entitled to 70 percent of the

profits from the NTC project for providing similar financial services.  According to Barone and Watkins, the profit split was designed to prevent the 70 percent of profits allocated to WB Partners from being exposed to the reach of WCI's creditors.

Next, section 4.2 of the NTC joint venture agreement protects WCI from incurring a loss on the NTC project, providing:

> 4.2  Reimbursement of WCI Costs and Expenses.  WCI shall be entitled to reimbursement from the NTC joint venture Account of all Direct Costs incurred by WCI in connection with the Subcontract Work, plus Five Percent (5%) of all such Direct Costs.  As herein, "Direct Costs" shall mean all direct costs and expenses reasonably incurred by WCI in connection with the Subcontract Work, but excluding therefore any indirect costs, including without limitation, overhead and general administrative expenses as determined in accordance with Federal government cost accounting standards.  WCI shall, on a monthly basis, submit to the Joint Venture an invoice for Direct Costs incurred, plus Five Percent (5%) of such costs.

Further, section 4.1 of the NTC joint venture agreement provides that payments from the NTC project may be made directly to WCI and requires such payments to be deposited in a bank account in the name of the NTC joint venture.  Finally, section 5.1 of the NTC joint venture agreement requires the NTC joint venture to maintain books and records and to file income tax returns.

Despite the NTC joint venture agreement, the Subcontract agreement with Harper was not amended to replace WCI with the NTC joint venture.  Moreover, only WCI, and not the NTC joint venture, had the proper contracting licenses to perform the physical work required by the NTC project.

C.    Conduct of the NTC joint venture

Once the NTC joint venture was formed, it applied for, obtained, and used its own employer identification number.  This employer identification number was used to open up the NTC joint venture bank account.  In addition to bank records, the NTC joint venture prepared its own income statements, work in progress schedules, and other financials.

On September 20, 2000, a general indemnity agreement was executed by and between the member companies of the American International Group (including, among others, the American Fidelity Co., the Insurance Co. of the State of Pennsylvania and the Commerce and Industry Co. of Canada) (together referred to as AIG), as the surety, and Barone, Watkins, WCI, WB Partners, DJB, GSW, and the NTC joint venture as the indemnitors.  On January 2, 2002, an additional indemnity agreement was issued naming the Greenwich Insurance Co. as the surety in connection with any bonds issued on behalf of WCI, WB Partners, DJB, GSW, and the NTC joint venture (together, the September 20, 2000, and January 2, 2002, agreements are hereinafter referred to as the indemnity agreements).  The indemnity agreements require the indemnitors to exonerate the surety for any costs incurred by reason of, among other things, the execution of a bond.

On October 18, 2000, a payment and performance bond was issued by the Insurance Co. of the State of Pennsylvania, as

surety, in the amount of $17,829,279, with WCI as the principal and Harper as the obligee.  On January 22, 2001, a replacement bond was issued in the amount of $17,001,072 to change the bond amount and to add McMillin as a dual obligee with Harper (together, the October 18, 2000, and January 22, 2001, bonds are hereinafter referred to as the NTC bond).  The NTC bond required the Insurance Co. of the State of Pennsylvania to complete the NTC project if WCI were to default on the subcontract agreement.

Consistent with the subcontract agreement, Harper paid WCI, and not the NTC joint venture or WB Partners, for the work performed on the NTC project.  In fact, Brad Humphrey, the project manager at Harper, testified that he was not familiar with WB Partners.  In contrast, Krispin Rosner (Rosner), a certified public accountant (C.P.A.) working for the accounting firm of Milloy Rosner & Brown (MRB), was familiar with the NTC joint venture, WCI, and WB Partners.  Rosner testified that MRB calculated the profits from the NTC joint venture and accounted for those profits on the tax returns of each of the joint venturers.  Rosner further testified that MRB did not file a tax return for the NTC joint venture.  On brief, petitioners contend that MRB treated the NTC joint venture as jointly controlled operations under generally accepted accounting principles (GAAP), and therefore it had no need to file its own tax return.

By September 30, 2002, WCI had billed Harper $14,100,332. At that time, the NTC joint venture had incurred costs related to the NTC project of $5,822,738, resulting in a profit of $8,277,599. Pursuant to the NTC joint venture agreement, WB Partners was entitled to 70 percent of the profits, or $5,714,319. However, Barone and Watkins instituted a profit cap, limiting WB Partners' allocation to $4,172,000, or 50.4 percent of the NTC joint venture profits. Barone and Watkins were the only persons involved in determining the profit split. On February 2, 2004, Harper certified the completion of the NTC project.

IV. Sale of WCI to Kuranda

On April 18, 2003, WCI entered into an asset purchase agreement with Kuranda Capital, LP (Kuranda), for the sale of substantially all of the assets of WCI (the asset purchase agreement). The final purchase price for the assets was $5,423,091, paid with $4,923,091 in cash and a $500,000 note payable to Watkins. In connection with the asset purchase agreement, Barone, Watkins, WB Partners, DJB, GSW, and WCI entered into a noncompetition agreement for the benefit of Kuranda (the noncompetition agreement). Exhibit B to the asset purchase agreement allocates $3,400,000 of the purchase price to the noncompetition agreement.

Section 1 of the noncompetition agreement prohibits Barone, Watkins, WB Partners, DJB, GSW, and WCI from engaging in "Competing Services" or from working for another company engaging in such services. For purposes of the noncompetition agreement, "Competing Services" is defined as any:

> (i) service that has been provided, performed or offered by or on behalf of * * * [WCI] (or any predecessor of * * * [WCI]) at any time on or prior to the date of this Noncompetition Agreement that involves or relates to asbestos, mold, and lead abatement in residential, commercial and government properties; (ii) service that is substantially the same as, is based upon or competes in any material respect with any service referred to in clause "(i)" of this sentence.

Further, recital D of the noncompetition agreement provides that WB Partners, through DJB's and GSW's exclusive employment agreements, controls the services of Barone and Watkins, including the right to enforce observation of the noncompetition requirements by each.

Pursuant to the $500,000 note, Kuranda agreed to pay Watkins the principal of the note plus interest at an annual rate of 10 percent. The proceeds of the noncompetition agreement and interest paid on the $500,000 note were included as income by WB Partners in its 2003 and 2004 Federal partnership income tax returns.

## V. Net Operating Loss

On its 2000 and 2001 Federal income tax returns, WCI claimed NOLs of $563,485 and $1,311,524, respectively. In 2002 WCI used

$443,077 of the NOL generated in 2000. In 2003, according to WCI's Federal income tax return, WCI used a balance of $159,593 from the NOL generated in 2000 and the entire $1,311,524 generated in 2001, for a total NOL deduction of $1,471,117.

Petitioners claim that the NOL generated in 2001 comprises in part the following: (1) An adjustment on Schedule M-1, Book to Tax Reconciliation, of $214,960; (2) professional fees of $243,199; and (3) cost of goods sold of $526,998. Rosner testified that the Schedule M-1 adjustment is an accounting adjustment made to reduce book income because WCI had reported an excess of book income when it was owned by REXX. Rosner further testified that the Schedule M-1 adjustment was the result of WCI's overstating its profits on three jobs in 2000. Next, petitioners provided canceled checks and the testimony of Rosner with respect to the legal and professional fees of $243,199. Finally, petitioners provided the general ledger of WCI with respect to the $526,998 attributable to cost of goods sold.

VI. Notices of Deficiency

On September 29, 2006, and November 27, 2007, respondent issued notices of deficiency to Acquisitions for the 2002 and 2003-2005 tax years, respectively.[6] On September 14 and November 21, 2007, respondent issued notices of final partnership administrative adjustment (the FPAAs) to WB Partners for the 2003

_____

[6]As discussed above, Acquisitions filed a consolidated tax return with WCI for taxable years 2002-2005.

and 2004-2005 tax years, respectively.  Petitioners timely filed their petitions in this Court.  The principal place of business of Acquisitions, WCI, and WB Partners is in California.

OPINION

I.  Burden of Proof

The Commissioner's determinations in the notice of deficiency are generally presumed correct, and the taxpayers bear the burden of proving them incorrect.  See Rule 142(a)(1).  In respect of any new matter pleaded in the answer, however, the Commissioner bears the burden of proof.  Id.  Here, because the issue was raised only in respondent's amended answer, respondent bears the burden of proof with respect to whether the NTC joint venture was a joint venture for Federal tax purposes in 2002, resulting in an assignment of income in 2002 from WCI to WB Partners.  Petitioners do not argue that the burden of proof shifts to respondent pursuant to section 7491(a) for any other issue or year, nor have they shown that the threshold requirements of section 7491(a) have been met for any of the other determinations at issue.  Accordingly, the burden remains on petitioners with respect to all other issues to prove that respondent's determination of deficiencies in income tax is erroneous.

II. The NTC joint venture

In United States v. Basye, 410 U.S. 441, 450 (1973), the Supreme Court reiterated the longstanding principle that income is taxed to the person who earns it, stating: "The principle of Lucas v. Earl, [281 U.S. 111, 115 (1930),] that he who earns income may not avoid taxation through anticipatory arrangements no matter how clever or subtle, has been repeatedly invoked by this Court and stands today as a cornerstone of our graduated income tax system." For a more recent formulation of this principle, see Commissioner v. Banks, 543 U.S. 426 (2005), which held that a contingent-fee agreement should be viewed as an anticipatory assignment to the attorney of a portion of the client's income from any litigation recovery. The entity earning income "cannot avoid taxation by entering into a contractual arrangement whereby that income is diverted to some other person or entity." United States v. Basye, supra at 449. We must determine whether the NTC Joint Agreement created a legitimate joint venture between WCI and WB Partners or was merely a vehicle to divert income from the NTC project to WB Partners and away from WCI.

Whether there is a partnership for tax purposes is a matter of Federal, not local, law. Commissioner v. Tower, 327 U.S. 280, 287-288 (1946); Estate of Kahn v. Commissioner, 499 F.2d 1186, 1189 (2d Cir. 1974), affg. Grober v. Commissioner, T.C.

Memo. 1972-240; <u>Beck Chem. Equip. Corp. v. Commissioner</u>, 27 T.C. 840, 849 (1957); <u>Comtek Expositions, Inc., v. Commissioner</u>, T.C. Memo. 2003-135, affd. 99 Fed. Appx. 343 (2d Cir. 2004). "[T]he term 'partnership' includes a syndicate, group, pool, joint venture or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not * * * a corporation or a trust or estate." Secs. 761(a), 7701(a)(2). The principles applied to determine whether there is a partnership for Federal tax purposes are equally applicable to determine whether there is a joint venture for Federal tax purposes. <u>Sierra Club, Inc. v. Commissioner</u>, 103 T.C. 307, 323 (1994), affd. in part and revd. in part on other grounds 86 F.3d 1526 (9th Cir. 1996); <u>Luna v. Commissioner</u>, 42 T.C. 1067, 1077 (1964); <u>Beck Chem. Equip. Corp. v. Commissioner</u>, <u>supra</u> at 848-849.

The required inquiry for determining the existence of a partnership for Federal income tax purposes is whether the parties "really and truly intended to join together for the purpose of carrying on business and sharing in the profits or losses or both." <u>Commissioner v. Tower</u>, <u>supra</u> at 287. Their intention is a matter of fact, "to be determined from testimony disclosed by their 'agreement, considered as a whole, and by their conduct in execution of its provisions.'" <u>Id.</u> (quoting <u>Drennen v. London Assurance Co.</u>, 113 U.S. 51, 56 (1885)).

In Commissioner v. Culbertson, 337 U.S. 733, 742 (1949), the Supreme Court elaborated on this standard and stated that there is a partnership for Federal tax purposes when

> considering all the facts--the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent--the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. * * *

In Luna v. Commissioner, supra at 1077-1078, this Court distilled the principles mentioned in Commissioner v. Tower, supra, and Commissioner v. Culbertson, supra, to set forth the following factors as relevant in evaluating whether parties intend to create a partnership for Federal income tax purposes (the Luna factors):

> The agreement of the parties and their conduct in executing its terms; the contributions, if any, which each party has made to the venture; the parties' control over income and capital and the right of each to make withdrawals; whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income; whether business was conducted in the joint names of the parties; whether the parties filed Federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers; whether separate books of account were maintained for the venture; and whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise.

See also Estate of Kahn v. Commissioner, supra at 1189.

None of the Luna factors is conclusive of the existence of a partnership.  Burde v. Commissioner, 352 F.2d 995, 1002 (2d Cir. 1965), affg. 43 T.C. 252 (1964); McDougal v. Commissioner, 62 T.C. 720, 725 (1974).  We apply each Luna factor to the facts of these cases to determine whether WCI and WB Partners engaged in a joint venture during the taxable periods at issue.

1.    The Agreement of the Parties and Their Conduct in Executing Its Terms

The NTC joint venture agreement sets forth the terms of the NTC joint venture.  However, the existence of a written agreement is not determinative of whether a joint venture existed between WCI and WB Partners.  See Sierra Club, Inc. v. Commissioner, supra at 324; Comtek Expositions, Inc. v. Commissioner, supra. It is well established that the tax consequences of transactions are governed by substance rather than form.  Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978).

The NTC joint venture agreement describes the anticipated conduct of, and relationship between, WCI and WB Partners in the NTC joint venture.  The NTC joint venture agreement includes, among other things, terms governing each joint venturer's participation in the preparation and submission of the proposal for the NTC project, obligations and responsibilities to the NTC joint venture, the receipt, allocation and distribution of profits, and the NTC joint venture's financial and tax reporting obligations.

Petitioners argue that WCI and WB Partners substantially complied with the terms of the NTC joint venture agreement. In at least three instances, however, WCI and WB Partners acted outside the plain language of the agreement. Most notably, Barone testified that because the NTC project was more profitable than expected, the NTC joint venture capped WB Partners' profits and awarded WCI approximately $1,600,000 more than it was entitled to pursuant to the NTC joint venture agreement. This additional allocation resulted in an actual allocation of profits between WCI and WB Partners of 49.6 and 50.4 percent, respectively. Respondent contends that the profit cap is a significant change from the 70 percent of profits allocated to WB Partners in section 4.4 of the NTC joint venture agreement.

The NTC joint venture agreement does not include a provision permitting WCI and WB Partners to institute a profit cap for either party. Further, although WCI and WB Partners had the right to amend the NTC joint venture agreement, there is no evidence of such an amendment. Accordingly, WCI and WB Partners did not comply with the terms of the NTC joint venture agreement with respect to the profit allocation.

In addition to the profit cap, respondent argues that the NTC joint venture failed to file a Federal income tax return as required pursuant to section 5.1 of the NTC joint venture agreement. Petitioners argue that MRB treated the NTC joint

venture as jointly controlled operations under GAAP using a method where each joint venturer included its share of the NTC joint venture profits in its income and its share of the NTC joint venture assets on its balance sheets.

MRB's treatment of the NTC joint venture pursuant to GAAP is not determinative as to whether the NTC joint venture must file a Federal income tax return. The treatment of an item for financial accounting purposes does not always mesh with its treatment for Federal tax purposes. Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 531 (1979); see also Hamilton Indus., Inc. v. Commissioner, 97 T.C. 120, 128 (1991); UFE, Inc. v. Commissioner, 92 T.C. 1314, 1321 (1989); Sandor v. Commissioner, 62 T.C. 469, 477 (1974), affd. 536 F.2d 874 (9th Cir. 1976). Further, MRB's treatment of the NTC joint venture pursuant to GAAP does not affect whether WCI and WB Partners executed the terms of the NTC joint venture agreement. Accordingly, the NTC joint venture's failure to file a Federal income tax return is a substantive deviation from the NTC joint venture agreement.

The first Luna factor weighs against finding a joint venture between WCI and WB Partners. WCI and WB Partners failed to comply with the terms of the NTC joint venture agreement with respect to the allocation of profits and tax return filing requirements. We find this failure to comply to be a significant deviation from the NTC joint venture agreement.

2.   <u>The Contributions, If Any, Which Each Party Has Made to the Venture</u>

We have held that both parties do not have to be active participants to a venture, so long as there is an intent to form a business together.  <u>70 Acre Recognition Equip. Pship. v. Commissioner</u>, T.C. Memo. 1996-547.  Nonetheless, both parties to the common enterprise must contribute elements necessary to the business.  See <u>Beck Chem. Equip. Corp. v. Commissioner</u>, 27 T.C. at 852; <u>Wheeler v. Commissioner</u>, T.C. Memo. 1978-208.

The Supreme Court has indicated that the services or capital contributions of a partner need not meet an objective standard.  See <u>Commissioner v. Culbertson</u>, 337 U.S. at 742-743.  The Court further stated:

> If, upon a consideration of all the facts, it is found that the partners joined together in good faith to conduct a business, having agreed that the services or capital to be contributed presently by each is of such value to the partnership that the contributor should participate in the distribution of profits, that is sufficient. * * *

<u>Id.</u> at 744-745.  Accordingly, the Tax Court may not substitute its judgment for that of the parties in determining the value of their contributions.  <u>Id.</u>

Petitioners and respondent agree that WCI made significant contributions to the NTC joint venture.  Respondent contends, however, that WB Partners failed to contribute to and was therefore unnecessary to the NTC joint venture.  WB Partners' obligations and responsibilities to the NTC joint venture are set

forth in section 2.1.2 of the NTC joint venture agreement, which provides:

> 2.1.2 <u>Obligations and Responsibilities of WB</u>.  The proposal shall provide that WB shall have responsibility for providing Indemnity and Financing Services to WCI so that WCI has the financial capability to perform the subcontract work.

Petitioners argue that WB Partners fulfilled its obligations to the NTC joint venture by contributing its rights to the financing capabilities and bonding guaranty services of Barone and Watkins, which were essential to the NTC joint venture.  Additionally, petitioners argue that WCI would not have been able to obtain the NTC bond without WB Partners' financial guaranties, which were necessary to securing the NTC project.

Petitioners argue that because WB Partners is a legitimate entity, its contributions to the NTC joint venture must be respected pursuant to <u>Forman v. Commissioner</u>, 199 F.2d 881 (9th Cir. 1952), vacating a Memorandum Opinion of this Court.  In <u>Forman</u>, the court held a partnership between a husband and wife to be valid.  In finding the partnership to be valid, the court observed that not all business relationships between a husband and wife are shams for tax purposes and that a court must respect the valuable contributions of a wife where the facts dictate. Petitioners urge us to adopt this policy in the context of related entities.

We conclude that <u>Forman</u> is not dispositive of the issue. The question is not whether WB Partners is capable of a valuable contribution, but rather, whether it made a valuable contribution. In other words, what was the value of WB Partners' contribution to the joint venture?

Petitioners argue that WB Partners made significant contributions to the NTC joint venture by providing the financial services and expertise of Barone and Watkins, as well as providing the financial resources necessary to obtaining the NTC bond. We first analyze the value of the financial services and expertise of Barone and Watkins.

As discussed above, we may not substitute our judgment for the judgment of petitioners in determining the value of the services WB Partners contributed to the NTC joint venture. Nonetheless, we must determine whether WB Partners contributed the financial services of Barone and Watkins in good faith for purposes of conducting a business. Respondent argues that WCI was entitled to the services and expertise of Barone and Watkins because of their roles as WCI corporate officers. Accordingly, respondent contends that WB Partners furnished nothing of value to WCI apart from services which WCI could have engaged directly had the NTC joint venture not been created.

The rights to the services and expertise of Barone and Watkins were ostensibly contributed to WB Partners from DJB and

GSW pursuant to section 1.6 of the WB Partners partnership agreement.  DJB and GSW held exclusive rights to the financing, construction management, and indemnity services of Barone and Watkins pursuant to section 2.2 of their respective employment agreements.  If we are to respect these agreements, Barone and Watkins were contractually forbidden from providing these services to WCI in their roles as corporate officers.  As discussed above, however, it is well established that the tax consequences of transactions are governed by substance rather than form.  <u>Frank Lyon Co. v. United States</u>, 435 U.S. at 573.  Accordingly, we must determine whether Barone and Watkins conducted themselves in a manner consistent with their respective employment agreements with DJB and GSW.

Throughout the NTC project, WCI had other projects in progress, projects that did not involve WB Partners, DJB, or GSW.  In discussing contracts outside the NTC project at trial, Watkins testified that he "bid and got and oversaw three quarters of the rest of them."  In doing so, Watkins regularly conducted activities as an officer of WCI that he was contractually obligated to exclusively provide to GSW.  Further, Barone testified that while WCI was owned by REXX, his responsibilities included "anything from managing employees to handling finance to business development."  He described these duties to include managing projects.  After WCI was repurchased from REXX, Barone

testified that his duties remained the same as CEO of WCI, where he mostly oversaw the NTC project but managed other projects as well.  Accordingly, the exclusivity clause of the employment agreements did not prevent Barone and Watkins from providing allegedly restricted services in their capacity as officers of WCI.  Because Barone and Watkins failed to respect the language of the exclusivity clauses of the employment agreements, we do the same, and we find that WB Partners' contribution of the services of Barone and Watkins to the NTC joint venture was not necessary for the purpose of conducting the NTC project.

Next, petitioners argue that WB Partners contributed its financial guaranties to the NTC joint venture.  In determining the value of this contribution, petitioners rely on the agreement among Barone, Watkins, and REXX for Barone and Watkins' personal guaranties to secure the bond for the IDIQ project.  In return for their guaranties Barone and Watkins were given 66.66 percent of the profits from the project.  Petitioners claim that this agreement was used as a model to value WB Partners' interest in the NTC joint venture.

Petitioners argue that WCI could not have obtained the NTC bond without WB Partners' financial guaranties.  Petitioners overlook, however, that the NTC bond was issued on the basis of the combined net worth and financial guaranties of each of WCI, WB Partners, Barone, Watkins, DJB, and GSW.  In doing so,

petitioners ignore the reality of WB Partners' contribution. The NTC joint venture was not necessary for WB Partners' financial guaranty, nor was it necessary for WCI to obtain the NTC bond. WB Partners was a required indemnitor under the indemnity agreements because WB Partners was related to WCI, not because WB Partners provided any unique value to the NTC joint venture. Accordingly, no different from those of Barone, Watkins, DJB, and GSW, WB Partners' financial guaranties were not intertwined with its participation in the NTC joint venture. This is a significant distinction from the agreement among Barone, Watkins, and REXX for the guaranties provided in the IDIQ project. The guaranties of Barone and Watkins required compensation from REXX.

Further, despite requiring the financial guaranties of Barone, Watkins, DJB, and GSW to obtain the NTC bond, WCI did not enter into a joint venture agreement with anyone but WB Partners. Neither Barone, Watkins, DJB, nor GSW was entitled to a portion of the profits from the NTC joint venture in exchange for making contributions identical to that of WB Partners. Petitioners do not explain why the financial guaranties of these other parties were valueless while WB Partners' guaranties entitled it to a significant portion of the NTC joint venture profits. This arrangement is not indicative of an arm's-length negotiation between uncontrolled parties.

The contributions of WB Partners to the NTC joint venture were of little value to the NTC project. Accordingly, this <u>Luna</u> factor weighs against the finding that WB Partners and WCI engaged in a joint venture.

3. <u>The Parties' Control Over Income and Capital and the Right of Each To Make Withdrawals</u>

WCI entered into the contract for the NTC project with Harper and was entitled to all payments from the job. Pursuant to the NTC joint venture agreement, however, WCI was required to deposit the funds received from Harper into the NTC joint venture bank account. Petitioners posit that Barone and Watkins wore two hats in dealing with the income and capital received from the NTC joint venture. Specifically, petitioners argue that Barone and Watkins wore one hat to represent the best interests of WCI and another hat to represent the independent and often competing interests of WB Partners. Accordingly, petitioners argue that Barone and Watkins, on behalf of both WCI and WB Partners, exercised control over the income and capital and the right of each entity to make withdrawals.

Throughout their arguments, petitioners set forth this theory that Barone and Watkins wore two hats in negotiations and transactions affecting related entities under their control. For the Court to respect this theory requires evidence that decisions affecting WCI and WB Partners were conducted at arm's length. We cannot reconcile the profit cap with petitioners' two hat theory.

Petitioners contend that it was decided to cap WB Partners' share of the profits because the NTC joint venture was more profitable than expected. Without further explanation, petitioners describe this as a "valid business reason." This justification is not sufficient. Pursuant to the NTC joint venture agreement, WB Partners was entitled to 70 percent of the profits from the NTC joint venture. Petitioners have not presented any legitimate reason why WB Partners would forfeit its contractual right to 19.6 percent of the NTC joint venture profits. Such a forfeiture is not indicative of the conduct of unrelated parties in an arm's-length agreement.[7]

Accordingly, WCI and WB Partners did not exercise control over the income and capital of the NTC joint venture in a manner commensurate with their joint venture interests. This Luna factor weighs against a finding that WB Partners and WCI engaged in a joint venture.

---

[7]Petitioners argue that the profit cap is evidence that the NTC joint venture was not entered into for tax purposes. Petitioners contend that had they been motivated by tax concerns, they would not have allocated an additional $1,600,000 to WCI, subjecting that amount to an increased net tax. We decline to speculate as to the intent of WCI and WB Partners in instituting the profit cap. The end result was a forfeiture of income in a manner that fails to represent an arm's-length transaction.

4.   <u>Whether Each Party Was a Principal and Coproprietor,
     Sharing a Mutual Proprietary Interest in the Net
     Profits and Having an Obligation To Share Losses, or
     Whether One Party Was the Agent or Employee of the
     Other, Receiving for His Services Contingent
     Compensation in the Form of a Percentage of Income</u>

Since its inception WB Partners has filed financials and tax returns and has engaged in investment activities outside of the NTC joint venture.  WB Partners is not a sham for tax purposes.

Petitioners argue that Barone and Watkins, on behalf of WB Partners, contributed indemnity and financing services to the NTC joint venture; that WCI contributed environmental remediation, construction, and licensing services; and that section 4.4 of the NTC joint venture agreement allocates the net profit of the NTC joint venture between WCI and WB Partners accordingly.  However, as discussed above, a profit cap was instituted to limit the profit share of WB Partners.  This profit cap is more indicative of a contingent compensation arrangement than a mutual proprietary interest.

Further, WCI does not have an obligation to share pro rata in the NTC joint venture losses.  Section 4.2 of the NTC joint venture agreement provides:

> 4.2  <u>Reimbursement of WCI Costs and Expenses</u>.  WCI shall be entitled to reimbursement from the NTC joint venture Account of all Direct Costs incurred by WCI in connection with the subcontract Work, plus Five Percent (5%) of all such Direct Costs.  As herein, "Direct Costs" shall mean all direct costs and expenses reasonably incurred by WCI in connection with the subcontract Work, but excluding therefore any indirect costs, including without limitation, overhead and general administrative expenses as determined in accordance

with Federal government cost accounting standards.  WCI
shall, on a monthly basis, submit to the Joint Venture an
invoice for Direct Costs incurred, plus Five Percent (5%) of
such costs.

Petitioners concede that pursuant to this provision, any
possibility of loss to WCI on the NTC project was virtually
eliminated (i.e., it was guaranteed reimbursement of direct costs
plus 5 percent).  Petitioners argue, however, that WCI's
obligation on the NTC bond left it at risk to the extent of its
net worth.  We do not find this risk relevant to the inquiry.
WCI agreed to the NTC bond and the indemnity agreements as an
entity separate from the NTC joint venture.  Accordingly, any
resulting risk is an independent business obligation, and not a
risk resulting from WCI's participation in the NTC joint venture.

WCI and WB Partners did not share in the profits of the NTC
joint venture in a manner consistent with a mutual proprietary
interest.  Further, WCI did not share pro rata in the losses from
the NTC joint venture.  Accordingly, this <u>Luna</u> factor weighs
against the finding that WB Partners and WCI engaged in a joint
venture.

5.    <u>Whether Business Was Conducted in the Joint Names of
the Parties</u>

The evidence with respect to this <u>Luna</u> factor is mixed.
WCI, not the NTC joint venture, entered into the subcontract
agreement.  WCI billed Harper, and Harper made payments directly
to WCI.  Further, WCI is the principal on the NTC bond, not the

NTC joint venture. On the other hand, the NTC joint venture applied for, obtained, and used its own employer identification number. The NTC joint venture also (1) used its employer identification number to open the NTC joint venture bank account,(2) signed the indemnity agreements, and (3) conducted business as a joint venture with the MRB accounting firm.

Accordingly, this Luna factor is neutral with respect to whether WCI and WB Partners engaged in a joint venture.

6. Whether the Parties Filed Federal Partnership Returns or Otherwise Represented to Respondent or to Persons With Whom They Dealt That They Were Joint Venturers

The NTC joint venture did not file a Federal partnership income tax return as required by the NTC joint venture agreement. Further, WCI did not represent itself as a member of the NTC joint venture in its negotiations, agreement, and dealings with Harper. At trial, Humphrey, Harper's primary representative on the NTC project, testified that he was not aware of WB Partners.

In many other respects, WCI and WB Partners represented themselves as joint venturers. As discussed above, the NTC joint venture used its own employer identification number, opened a bank account, and signed the indemnity agreements. In doing so, WCI and WB Partners represented themselves as joint venturers to, among others, AIG, the Greenwich Insurance Group, the Insurance Co. of the State of Pennsylvania, and Wells Fargo Bank.

The NTC joint venture did not file a Federal income tax return; however, in certain instances it was represented to third parties as a joint venture between WCI and WB Partners. Accordingly, this Luna factor is neutral with respect to whether WCI and WB Partners engaged in a joint venture.

7.    Whether Separate Books of Account Were Maintained for the Venture

The NTC joint venture maintained separate books for the NTC joint venture bank account.  Further, the NTC joint venture created separate income statements.  Other documents, such as work-in-progress reports, were created in the name of the NTC joint venture.  These documents were labeled as documents of the NTC joint venture; however, they were prepared by WCI employees. Further, no other books of account that may normally be expected in the operation of a business were maintained for the NTC joint venture.  Accordingly, this Luna factor is neutral with respect to whether WCI and WB Partners engaged in a joint venture.

8.    Whether the Parties Exercised Mutual Control Over and Assumed Mutual Responsibilities for the Enterprise

Petitioners once again set forth the theory that Barone and Watkins wore two hats in representing both WCI and WB Partners in the mutual control of the NTC joint venture.  As discussed above, this theory requires evidence of arm's-length dealings between the two entities.  Absent evidence of a reasonable business purpose to justify a forfeiture, the Court does not believe that

WB Partners exercised mutual control over the NTC joint venture when WB Partners conceded a significant portion of the profits it was entitled to pursuant to the NTC joint venture agreement. Petitioners have failed to present such a business purpose. Accordingly, this <u>Luna</u> factor weighs against a finding that WB Partners and WCI engaged in a joint venture.

Five of the eight <u>Luna</u> factors weigh against a finding of a joint venture and three <u>Luna</u> factors are neutral. Applying the various <u>Luna</u> factors, with no one factor being conclusive, we hold there was no joint venture between WCI and WB Partners during the taxable periods at issue.

We reach the same conclusion using the overall intent approach set forth in <u>Commissioner v. Culbertson</u>, 337 U.S. 733 (1949). WCI conducted all of the business of the NTC joint venture throughout the NTC project. As discussed above, WB Partners did not contribute anything of substance to the NTC joint venture. Considering all the facts and circumstances and in accordance with our analysis of the <u>Luna</u> factors, we find that WCI and WB Partners did not intend to join together in the conduct of a joint venture.[8] As a result, respondent has met his

_____

[8]Petitioners spent significant time throughout these cases discussing the benefits of the NTC joint venture in isolating WB Partners' allocation of profits from the NTC project from WCI's other creditors. Petitioners argue that this nontax business purpose supports the economic substance of the NTC joint venture and is evidence of the parties' intent to join together. Having already held that WCI and WB Partners did not conduct a joint
(continued...)

burden of proof for 2002 and petitioners have failed to meet their burden of proof for 2003 and 2004. Accordingly, we sustain respondent's determinations with regard to the NTC joint venture for 2002-2004.

III. Sale of WCI

On April 18, 2003, WCI entered into an asset purchase agreement for the sale of substantially all of the assets of WCI to Kuranda for $5,423,091. The parties allocated $3,400,000 of the purchase price to the noncompetition agreement. The proceeds of the noncompetition agreement and interest paid on the $500,000 note were included as income by WB Partners on its 2003 Federal partnership income tax return. Respondent contends that the assets sold belonged to WCI and, therefore, the proceeds of the noncompetition agreement and interest paid on the $500,000 note should be properly included as income to WCI, not WB Partners.

Petitioners argue that the exclusive services of Barone and Watkins belonged to DJB and GSW through their respective employment agreements and that those rights were contributed by DJB and GSW to WB Partners. Petitioners therefore contend that because WB Partners controlled the exclusive rights to the services of Barone and Watkins and because without those services

_____

[8](...continued)
venture, we need not decide whether the NTC joint venture had economic substance. Insofar as the NTC joint venture isolated WB Partners' share of the NTC project profits from WCI's creditors, this result does not reflect an intent of the parties to join together to conduct a business.

it would be impossible for an entity controlled by Barone and Watkins to compete with Kuranda, the proceeds of the noncompetition agreement were properly included in the income of WB Partners.

Petitioners rely on section 1.1.4 and 1.3 of the employment agreements, which was added by amendment on December 3, 2002. Section 1.1.4 of each employment agreement provides that the exclusive service provided by Barone and Watkins include any and all services related to the present or future business of DJB, GSW, WB Partners, WCI, the NTC joint venture, or any party that acquires an interest in any of the above-listed entities. Section 1.3 is a noncompetition provision which prevents Barone and Watkins from engaging in any business activity which is, or could become, competitive with or adverse to the above-listed entities. Petitioners further rely on recital D of the noncompetition agreement, which provides that WB Partners, through DJB's and GSW's exclusive employment agreements, controls the services of Barone and Watkins, including the rights to enforce observation of the noncompetition requirements by each. Petitioners argue that this provision is evidence that Kuranda recognized that the rights to these services belonged to WB Partners.

In our discussion of the Luna factors we held that WB Partners did not contribute the services of Barone and Watkins to

the NTC joint venture because WCI was able to engage those services from Barone and Watkins in their capacities as corporate officers.  In doing so, we analyzed substance over form to determine that Barone and Watkins did not conduct themselves consistently with the exclusivity clauses of their respective employment agreements.  This substance over form analysis is equally applicable to determine whether WB Partners properly included the proceeds of the noncompetition agreement in its 2003 gross income.

The noncompetition agreement prevents Barone and Watkins and any related entity from participating in "Competing Services." The noncompetition agreement defines "Competing Services" as any:

> (i) service that has been provided, performed or offered by or on behalf of * * * [WCI] (or any predecessor of * * * [WCI]) at any time on or prior to the date of this Noncompetition Agreement that involves or relates to asbestos, mold, and lead abatement in residential, commercial and government properties; (ii) service that is substantially the same as, is based upon or competes in any material respect with any service referred to in clause "(i)" of this sentence.

According to the subcontract agreement and the testimony of Humphrey, Barone, and Watkins, the physical work of the NTC project was performed by WCI.  WCI had the proper licenses and permits to perform the necessary construction and excavation work, not WB Partners, DJB, GSW, or the NTC joint venture. Petitioners describe WB Partners, DJB, and GSW as investment vehicles, not businesses engaged in performing services.  Except

for WCI, nothing in the record suggests that any of the entities controlled by Barone and Watkins performed services involving or related to "asbestos, mold, and lead abatement in residential, commercial and government properties".  Despite the language of the employment agreements, the asset purchase agreement, and the noncompetition agreement, in reality WCI was the only entity involved that actively conducted the "Competing Services." Accordingly, WCI, and not WB Partners, owned the rights to the future performance of such services, and we sustain respondent's determination with respect to the noncompetition agreement.

As discussed above, WB Partners recognized interest income on its 2003 and 2004 partnership Federal income tax returns for interest paid by Kuranda on the $500,000 note.  Respondent contends that because the proceeds of the noncompetition agreement properly belonged to WCI, any interest on the $500,000 note is interest income to WCI.  Having sustained respondent's determination with respect to the noncompetition agreement, we further sustain respondent's determination that interest paid on the $500,000 note must be included as interest income to WCI, and not WB Partners, in 2003 and 2004.

Finally, respondent contends that because WCI must recognize income from the proceeds of the noncompetition agreement and interest income from the $500,000 note, it is entitled to related deductions claimed by WB Partners.  We agree.  Accordingly, we

sustain respondent's determination with respect to deductions related to the noncompetition agreement and $500,000 note.

IV.  NOL

Petitioners bear the burden of establishing both the existence and amounts of NOL carrybacks and carryforwards.  See Rule 142(a); Keith v. Commissioner, 115 T.C. 605, 621 (2000); Lee v. Commissioner, T.C. Memo. 2006-70.  Taxpayers are required to maintain records sufficient to establish the amounts of allowable deductions and to enable the Commissioner to determine the correct tax liability.  Sec. 6001; Shea v. Commissioner, 112 T.C. 183, 186 (1999).  If a factual basis exists to do so, the Court may in some contexts approximate an allowable expense, bearing heavily against the taxpayer who failed to maintain adequate records.  Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930); see sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985).  However, in order for the Court to estimate the amount of an expense, the Court must have some basis upon which an estimate may be made.  Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985).  Without such a basis, any allowance would amount to unguided largesse.  Williams v. United States, 245 F.2d 559, 560-561 (5th Cir. 1957).

In 2000 and 2001 WCI claimed NOLs of $563,485 and $1,311,424, respectively.  In 2002 WCI used $443,077 of the NOL generated in 2000.  In 2003, according to WCI's Federal income

tax return, WCI used a balance of $159,593 from the NOL generated in 2000 and the entire $1,311,424 generated in 2001, for a total NOL deduction of $1,471,117. Respondent conceded that petitioners have substantiated the $563,485 NOL generated in 2000.

As a preliminary matter, respondent argues in his reply brief for the first time that WCI miscalculated its NOL carryover from 2002, resulting in double counting in both 2002 and 2003 of a portion of the NOL generated in 2000. Respondent concedes that this issue has not been raised previously; however, respondent argues that pursuant to Rule 41(b)(1) an issue may be tried even if the issue was not raised in the pleadings. Rule 41(b)(1) provides that in appropriate circumstances, an issue that was not expressly pleaded, but was tried by express or implied consent of the parties, may be treated in all respects as if raised in the pleadings. LeFever v. Commissioner, 103 T.C. 525, 538-539 (1994), affd. 100 F.3d 778 (10th Cir. 1996). This Court, in deciding whether to apply the principle of implied consent, has considered whether the consent results in unfair surprise or prejudice to the consenting party and prevents that party from presenting evidence that might have been introduced if the issue had been timely raised. See Krist v. Commissioner, T.C. Memo. 2001-140; McGee v. Commissioner, T.C. Memo. 2000-308.

WCI's 2002 Federal income tax return shows that WCI used $443,077 of the $563,485 NOL generated in 2000. This would leave a carryover of the NOL generated in 2000 of $120,408. However, on its 2003 Federal income tax return, WCI claimed a carryover NOL from 2000 of $159,593. Accordingly, respondent argues that WCI overstated the carryover from the NOL generated in 2000 by $39,185. The only explanation for this discrepancy on the record is found in the workpapers of MRB, which describe the $39,185 as a "contribution * * * [carryover] converted into an NOL". Because respondent raised this issue for the first time in his reply brief and because the record provides a possible explanation for the discrepancy, we find that petitioners would be unfairly prejudiced if we were to consider this issue without petitioners' having the opportunity to respond. Accordingly, we do not find implied consent pursuant to Rule 41(b)(1), and the Court will not consider whether WCI overstated the carryover by $39,185.

Next, respondent contends that petitioners have failed to substantiate the $1,311,424 NOL generated in 2001 and used in 2003. Petitioners have presented evidence with respect to three items making up a portion of the NOL generated in 2001: (1) An adjustment on Schedule M-1 of $214,960; (2) professional fees of $243,199; and (3) cost of goods sold of $526,998. These items combined make up $985,157 of the $1,311,424 NOL claimed.

Petitioners argue that respondent asked for information to substantiate the NOL deductions during the examination process. Petitioners contend that respondent has challenged only the three items above and conceded the balance. There is no evidence on the record to support this assertion.

Petitioners' evidence respecting the $1,311,424 NOL generated in 2001 is confined to the three items listed above. Accordingly, before examining the weight of that evidence, we find that petitioners have failed to substantiate the remaining $326,267 of the NOL generated in 2001, and we sustain respondent's determination with regard to this remainder.

Petitioners claim to have substantiated a $214,960 Schedule M-1 adjustment. At trial, petitioners' C.P.A. Rosner testified that the Schedule M-1 adjustment is an accounting adjustment made to reduce book income because WCI had reported an excess of book income when it was owned by REXX. Rosner further testified that the Schedule M-1 adjustment was the result of WCI's overstating its profits on three jobs in 2000. Petitioners did not describe the three jobs for which WCI overstated profits in 2000. Further, petitioners failed to explain how it was determined that profits in 2000 were overstated or provide any documentation to evidence this determination. Accordingly, petitioners have failed to meet their burden of proof, and we sustain respondent's determination with regard to the Schedule M-1 adjustment.

Petitioners provided canceled checks and the testimony of Rosner to substantiate legal and professional fees of $243,199. Respondent argues that because the canceled checks do not include memo lines describing the nature of the work provided, petitioners have failed to substantiate that the amounts were paid for ordinary and necessary business expenses. We disagree with respondent. The parties have stipulated that the canceled checks reflect amounts paid by WCI to various law firms or other entities providing legal services, and Rosner testified to his discussions with the revenue agent with respect to legal and professional fees during examination. Further, the legal and professional fees were consistent with similar expenses claimed by WCI in 2000, 2002, and 2003. Accordingly, we find that WCI is entitled to $243,199 of the NOL attributable to legal and professional fees.

Finally, petitioners provided the general ledger of WCI as evidence of the $526,998 attributable to cost of goods sold. Petitioners have not provided receipts, invoices, canceled checks, or any other evidence to prove the nature of these expenses or whether such expenses were paid. Accordingly, petitioners have failed to meet their burden of proof, and we sustain respondent's determination with regard to the cost of goods sold.

V.    Section 6662(a) Penalty

Section 6662(a) and (b)(2) imposes an accuracy-related penalty upon any underpayment of tax resulting from a substantial understatement of income tax.  The penalty is equal to 20 percent of the portion of any underpayment attributable to a substantial understatement of income tax.  Id.  An understatement is "substantial" if it exceeds the greater of:  (1) 10 percent of the tax required to be shown on the return for the taxable year or (2) $5,000 ($10,000 in the case of a corporation).  Sec. 6662(d)(1).  Section 6662(a) and (b)(1) also imposes a penalty equal to 20 percent of the amount of an underpayment attributable to negligence or disregard of rules or regulations.  Negligence includes any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code, including any failure to maintain adequate books and records or to substantiate items properly.  Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs.

Respondent has the burden of production with respect to the accuracy-related penalty.  To meet this burden, respondent must produce sufficient evidence indicating that it is appropriate to impose the penalty.  See Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  Once respondent meets this burden of production, petitioners have the burden of proving that respondent's determination is incorrect.  See Rule 142(a); Higbee v.

<u>Commissioner</u>, <u>supra</u> at 446-447. Petitioners' underpayments of tax resulting from our determinations exceed $5,000 for each year in issue. Further, petitioners' failure to produce records substantiating their claimed NOL deductions supports the imposition of the accuracy-related penalty for negligence with respect to those deductions for the years at issue.

An accuracy-related penalty is not imposed on any portion of the underpayment as to which the taxpayer acted with reasonable cause and in good faith. Sec. 6664(c)(1). A taxpayer may be able to demonstrate reasonable cause and good faith (and thereby escape the accuracy-related penalty of section 6662) by showing its reliance on professional advice. See sec. 1.6664-4(b)(1), Income Tax Regs. However, reliance on professional advice is not an absolute defense to the section 6662(a) penalty. <u>Freytag v. Commissioner</u>, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). A taxpayer asserting reliance on professional advice must prove: (1) That his adviser was a competent professional with sufficient expertise to justify reliance; (2) that the taxpayer provided the adviser necessary and accurate information; and (3) that the taxpayer actually relied in good faith on the adviser's judgment. See <u>Neonatology Associates, P.A. v. Commissioner</u>, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d Cir. 2002). As a defense to the penalty, petitioners bear the burden of proving that they acted with

reasonable cause and in good faith.  See Higbee v. Commissioner, supra at 446.

Petitioners argue that they relied on Rosner, as a tax specialist, to determine the tax treatment of the transactions at issue.[9]  Petitioners contend that they have established Rosner as a professional with the requisite expertise, he was provided necessary and accurate information, and they relied on him in good faith.  We disagree.

Petitioners have failed to set forth any evidence that Rosner was provided with all the necessary and accurate information.  In fact, Rosner testified that he was not involved in any discussions about the structure of the transactions at issue and that he merely prepared financial statements and returns based on the information he was provided.  Accordingly, petitioners have failed to show reasonable cause or any other basis for reducing the penalties, and we find them liable for the section 6662 penalty for the years at issue as commensurate with the concessions and our holding.  See id.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

---

[9]Petitioners do not argue that they relied on the professional advice of Ryder despite his role in structuring the entities controlled by Barone and Watkins.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.