# United States Tax Court

T.C. Memo. 2022-86

ALEXANDER C. DEITCH,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

JONATHAN D. BARRY AND SUSAN S. BARRY,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos. 21282-17, 21283-17.        Filed August 25, 2022.

————

Ps were partners in the partnership WTS. In 2006 WTS purchased a commercial rental property in Georgia by financing the property with the proceeds of a loan from PLI. The integrated loan documents included an "Additional Interest Agreement" that entitled PLI to additional interest of two types—"NCF Interest" (i.e., 50% of the net cashflow from the property) and "Appreciation Interest" (i.e., 50% of the appreciation in the value of the property if it was ever sold or the loan was terminated). WTS owned no other real property.

During the years WTS owned the commercial rental property, it made regular loan payments to PLI, which consisted of repayment of principal, stated interest at a fixed rate, and 50% of the net income from the property, all of which it characterized as interest. WTS sold the

**[*2]** property in 2014 and, in accordance with the loan documents, paid to PLI the appreciation interest.

On its partnership tax return for 2014, WTS claimed an I.R.C. § 163(a) deduction for its payment of the appreciation interest to PLI and reported a net loss in excess of $1 million on the commercial rental property. WTS reported net I.R.C. § 1231 gain of $2.6 million. Ps reported their distributive shares of income and loss of WTS on their individual income tax returns for 2014.

R sent statutory notices of deficiency to Ps, determining that Ps' incomes should each be increased by $517,841, resulting from R's disallowance of the appreciation interest WTS claimed as a deductible interest expense.

*Held*: Notwithstanding I.R.C. § 6221(a) and Tax Court Rule 240(c), we have jurisdiction to determine whether WTS and PLI were engaged in a joint venture constituting a partnership for federal income tax purposes, and we hold that they were not so engaged.

*Held, further*, PLI did not have a "single equity interest" in its dealings with WTS that transformed WTS's loan payments on genuine indebtedness to PLI into guaranteed payments made to a partner pursuant to I.R.C. § 707(c).

*Held, further*, in light of the facts stipulated by the parties, the appreciation interest that WTS paid to PLI was interest deductible under I.R.C. § 163, not a payment in respect of any equity interest held by PLI.

———————

*David D. Aughtry* and *John W. Hackney*, for petitioners.

*Christopher D. Bradley*, for respondent.

**[\*3]**    MEMORANDUM FINDINGS OF FACT AND OPINION

GUSTAFSON, *Judge*:  In these consolidated cases, the Internal Revenue Service ("IRS") issued pursuant to section 6212[1] statutory notices of deficiency ("NOD") to petitioner Alex Deitch and to married petitioners Jonathan and Susan Barry[2] on July 14, 2017.  The NOD issued to Mr. Deitch determined a deficiency of $211,217 for 2014, and the NOD issued to Mr. and Mrs. Barry determined a deficiency of $188,271 for 2014.[3]  The issues for decision are: (1) whether West Town Square Investment Group, LLC ("WTS", which was co-owned by petitioners), and its lender Protective Life Insurance Co. ("PLI") formed a joint venture that was a partnership for federal income tax purposes (we hold that they did not); and (2) whether a payment in 2014 of $1,035,683 by WTS to PLI was deductible as interest under section 163 (we hold that it was).

FINDINGS OF FACT

On the basis of the parties' stipulations and the evidence before us, and employing the burden-of-proof principles set out below, we find the following facts.

*Petitioners*

At the time that they filed their Petitions in these consolidated cases, Mr. Deitch and Mr. and Mrs. Barry all resided in Georgia.  At all relevant times, Mr. Deitch and Mr. Barry worked in the commercial real estate industry, and Mr. and Mrs. Barry were married.

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code ("the Code", Title 26 of the United States Code) as in effect at the relevant times; references to regulations are to Title 26 of the Code of Federal Regulations ("Treas. Reg.") as in effect at the relevant times; and references to Rules are to the Tax Court Rules of Practice and Procedure.  Some dollar amounts are rounded.

[2] Jonathan D. Barry and Susan S. Barry are married petitioners in docket No. 21283-17 who filed jointly for 2014; they and Alex Deitch (the sole petitioner in docket No. 21282-17) are the three petitioners whose income tax liabilities for 2014 are addressed in this Opinion.  For convenience we use the term "petitioners" to refer to Messrs. Deitch and Barry, the sole partners in West Town Square.

[3] Each NOD also determined an accuracy-related penalty under section 6662, but the Commissioner has conceded the penalties, so we will not discuss them further.

**[*4]** *PLI*

From 2006 through 2014, PLI (the lender discussed below) was a subsidiary of Protective Life Corp. The parties stipulated that PLI "did not own a member interest" in WTS and that PLI and Protective Life Corp. were not related to petitioners or to WTS within the meaning of sections 267(b) and 707(b)(1).

*Organization and ownership of WTS*

On August 31, 2006, Mr. Barry organized WTS, a Georgia limited liability company, in order to purchase and operate a 6.85-acre parcel of commercial rental property on Shorter Avenue in Rome, Georgia (the "Rome property"). Mr. Deitch purchased an interest consisting of 500 membership units in WTS on December 13, 2006, for a price of five dollars. (Mr. Barry and Mr. Deitch had each made a capital contribution to WTS of five dollars.) Upon execution of a subscription agreement and an amendment to WTS's operating agreement, Mr. Deitch and Mr. Barry each owned 500 member units (i.e., a one-half interest in WTS), which was a partnership for federal income tax purposes. Mr. Barry served as the tax matters member[4] and company manager. WTS's stated company purpose was, among other things, "[t]o engage in any lawful business, purpose or activity . . . [of] acquiring, developing, improving, leasing (including leasing to affiliated Entities), managing, renovating, repairing, maintaining and selling, or otherwise dealing with, real property, including the [Rome] Property".

*WTS's deal to acquire the Rome property*

In 2006 Mr. Barry was operating a commercial real estate brokerage and property management company called Spectrum Cauble Management, a joint venture with Colliers International ("Colliers"). In that capacity he was commonly engaged by a tenant of a commercial property seeking other suitable commercial space, or alternatively, engaged by the owner of a commercial property to find suitable tenants. Mr. Barry first learned of the Rome property when one of his associates was engaged by Redmond Hospital to seek locations for an additional unit to provide physical therapy services outside of the hospital. The

---

[4] WTS's amended operating agreement makes this designation of a tax matters member pursuant to section 6231(a)(7) of the unified audit and litigation procedures of the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), Pub. L. No. 97-248, § 402(a), 96 Stat. 324, 663, discussed below. No TEFRA proceedings were undertaken before the issuance of the NODs to petitioners.

[*5] associate discovered that the Rome property was owned by Walmart Realty Co., and had formerly been the site of a Walmart store before being vacated, at which time the building was subdivided into three units. Two of the units were subleased, and the third (a 35,000-square-foot space) remained vacant. Mr. Deitch worked with Mr. Barry and discovered that the two existing tenants in the Rome property, Office Depot and Ferguson Plumbing, had relatively short terms remaining on their leases. Petitioners decided to make an offer to purchase the Rome property in order to rehabilitate it to suit the needs of Redmond Hospital, and then, as the new owners of the Rome property, to lease it to Redmond Hospital. In Mr. Barry's words, "initially [petitioners were the] broker trying to find a suitable location, and then landlord and investor to facilitate the transaction".

WTS projected that renovations to the entire exterior of the building plus the engagement of Redmond Hospital to be the third tenant would create substantial additional value for the property. Petitioners hired an architect and an engineer, selected appropriate contractors, and priced out the renovation, estimating that it would cost approximately $1.8 million to complete. They needed a loan "to put the entire transaction together", and such a loan would need to cover the $2.2 million acquisition cost of the property, a $700,000 allowance to Redmond Hospital for transferring their operations to a suitable facility, and construction costs for exterior renovations (totaling $4.4 million for the entire project).

Mr. Barry had a relationship with Colliers (by virtue of their joint venture, Spectrum Cauble) that gave him access to its mortgage origination group. Colliers was a correspondent lender for PLI, which meant that PLI had essentially given Colliers pre-approval to solicit lending opportunities for PLI in the marketplace. Mr. Barry knew of PLI's "well-known and highly successful participating loan program" and believed it would be suitable to fund the Rome property because it included both interim financing to complete the renovation and a permanent loan that "was a fixed-rate product [as opposed to a] more traditional commercial bank loan . . . [with] a floating rate". Mr. Barry stated that "even if I was paying a little bit more for the interest rate, I felt that the numbers laid out adequately for me to proceed."

*PLI's participating loan product*

PLI offered conventional and participating loans. In a participating loan, which is a high-leverage loan, PLI would lend up to

**[\*6]** 100% of the cost or 85% of the stabilized value of the property to be acquired.  For a conventional loan, on the other hand, the maximum loan-to-value ratio that PLI would approve was 75%.  The difference between the two types of loans (from PLI's perspective) is that the conventional loan is a stabilized product, meaning that "those cash flows [from the underlying property] are pretty much guaranteed for the life of the loan", whereas a participating loan is given where "the value is not yet created [and] has to be created through the process".

The typical loan documents PLI used with both conventional and participating loans included a promissory note, security instruments, the deed to secure debt, a limited guaranty, and indemnity agreements.  The primary difference between the loan documents PLI required for a conventional loan versus a participating loan was that a participating loan also required an additional interest agreement.

*PLI's loan commitment to WTS*

PLI issued a "Permanent Loan Commitment" to WTS on November 28, 2006, agreeing to provide secured first lien financing of up to $4.4 million for WTS to buy the Rome property.  PLI's loan commitment estimated that the minimum appraised value of the property for purposes of calculating the "initial funding" was $2.9 million, and that the minimum appraised value for purposes of calculating the "ceiling loan" was $5.2 million.  The loan commitment provided that PLI would initially disburse $2.4 million to WTS in order to acquire the property and provided for a "holdback" of $2 million.  The holdback amount was to be funded no later than a year after the initial funding, but only upon WTS's satisfying certain conditions with respect to completing the renovations, providing PLI with an appraisal meeting its requirements and subject to its approval, and executing all of the leases in full force and effect with tenants in occupancy.

In accordance with the requirements of the loan commitment, WTS provided PLI with an appraisal before closing on the loan.  The appraisal estimated that "the Prospective Value at Completion and Stabilization . . . [of the Rome property] is . . . $5,300,000."  That value was

> predicated upon completion of the building renovations in a workmanlike manner in conformity with the plans, specifications, and other financial representations made to the appraisers.  These representations included the

**[*7]**  extraordinary assumptions that the lease arrangement with Redmond Medical Center is in full force and effect as of the date of stabilization and that existing leases are assigned under the current terms and conditions.

Under the loan commitment, Mr. Barry personally guaranteed the repayment of the outstanding loan balance before the completion of the rehabilitation work specified in the loan, and was to be released from the guaranty thereafter.

The loan commitment also summarized the essential economic terms of the loan arrangement that would be reflected in the loan documents, including the interest due over the life of the loan.  It specified that loan proceeds would incur base interest at a fixed rate of 6.25% per annum (defined as "payment interest"), as well as "additional interest" of "fifty percent of the Net Cash Flow and Appreciation of the Project as provided in the Additional Interest Agreement attached"[5] to the loan commitment.  The commitment further stated:

> Upon acceptance of this Commitment by Borrower, the Additional Interest Agreement will be in full force and effect.  Borrower and Lender intend that Lender shall be entitled to receive its Net Cash Flow Interest and/or Appreciation Interest or Substitute Interest (all as defined in the Additional Interest Agreement) from any net cash flow or proceeds of any sale occurring at any time after the date upon which Borrower accepts this commitment.

WTS accepted the loan commitment on December 5, 2006, by paying a commitment fee of $44,274 and executing a copy of the commitment, thus entering into a binding contract.  WTS's acceptance of the loan commitment was also a binding acceptance of the Additional Interest Agreement.  Pursuant to the terms of the contract, PLI held the commitment fee pending the funding of the loan on the terms specified in the commitment; PLI later refunded that fee to WTS after all of the loan documents were executed and duly recorded.

---

[5] The Additional Interest Agreement that was attached to the loan commitment is in fact the same document with that title that is described below.  It contains the same section 7.4 quoted below (which includes the provision that "[n]othing contained in the Additional Interest Agreement . . . shall be deemed or construed to create a . . . joint venture . . . by or between Lender and Borrower").

**[\*8]** *WTS's purchase of the Rome property*

WTS agreed to purchase the Rome property from Walmart Realty Co. for $2.2 million and closed on its purchase on December 22, 2006. Other than proceeds from PLI's loan, the only cash that WTS put toward the closing on the property was a $50,000 earnest money deposit that became "hard money" after the due diligence period outlined in the loan documents, during which period WTS could have withdrawn from the deal with Walmart. PLI's initial disbursement of $2.4 million, along with WTS's earnest money deposit of $50,000, paid the purchase price and WTS's acquisition costs of approximately $250,000. (WTS received nearly all of its earnest money in cash back at closing.)

Over the life of the loan, the remaining proceeds (from the $2 million "holdback" portion) were used to pay $700,000 in specific renovations for Redmond Hospital, and approximately $1.3 million in general renovations for the benefit of the entire property. WTS was formed as a "single-purpose entity"; i.e., its purpose was to own and manage the Rome property; and it had minimal assets other than the Rome property and the leases on that property.

*Loan documents*

Consistent with the loan commitment, on December 22, 2006, WTS signed a promissory note ("the original note") and entered into a Deed to Secure Debt and Security Agreement (the "security agreement") by which it granted PLI a security interest in the Rome property and in the leases on the property. The three documents—the original note, the security agreement, and the Additional Interest Agreement—are integrated documents (negotiated and executed as a set) that cross-reference each other. The Additional Interest Agreement became effective on December 5, 2006, the date on which WTS accepted the loan commitment from PLI. The original note and the security agreement became effective December 22, 2006. The parties have stipulated that the original note, its modifications, and the Additional Interest Agreement (all of which the parties have stipulated treat WTS as the borrower and PLI as the lender) constitute legally enforceable agreements under Alabama law, and that the security agreement was legally enforceable under Georgia law. Further, the parties stipulated:

**[*9]**     34.     The Original Note, Modifications, Security Agreement, and Additional Interest Agreement arose from an arm's length transaction.

35.     The Original Note, Modifications, and Security Agreement[6] constitute genuine indebtedness by West Town Square to Protective Life.

*Original note*

The original note (and its modifications, discussed below) expressly treated WTS as the "Borrower" and PLI as the "Lender". Section 12 of the note provided:

> 12.     Relationship of Lender and Borrower as Creditor and Debtor Only. The relationship between Lender and Borrower is solely that of creditor and debtor and alternate forms of structuring the extension of credit, as well as alternate sources of financings, were available to Borrower and Borrower choose, however to proceed with the transaction in the manner described in the Additional Interest Agreement and other Loan Documents. Nothing contained in any Loan Document or instrument made in connection with the loan, shall be deemed or construed to create a partnership, tenancy-in-common, joint tenancy, joint venture, or co-ownership by or between Lender and Borrower, or any relationship other than that of creditor or debtor. . . .

As to WTS's debts and losses, section 12 also provided that PLI "shall not be in any way responsible or liable for the debts, losses, obligations

---

[6] Unlike paragraph 34, paragraph 35 of the Stipulation lists only three of the documents and not the Additional Interest Agreement; and the Stipulation is explicit (in paragraph 69) that "[t]he parties dispute whether the Additional Interest Agreement constitutes part of integrated loan documents". It is not clear whether the Commissioner still maintains that dispute, since his answering brief acknowledges that "the agreement between WTS and PLI, despite consisting of multiple documents, must be considered as a whole." In any event, the non-inclusion of the Additional Interest Agreement in paragraph 35 does not dissuade us from our conclusion, discussed below, that the entire $4.4 million amount of PLI's advances was a loan by PLI and was indebtedness [owed] by WTS, and that therefore the payments of "Additional Interest" were interest on indebtedness.

**[\*10]** or duties of Borrower or any guarantor with respect to the Property or otherwise."

The principal amount of the note was about $4.4 million, of which only about $2.4 million was disbursed as of December 22, 2006, the date of its execution. The terms obligated WTS to pay interest only on funds disbursed from the date of disbursement until January 1, 2008, the latest date of disbursement of any of the remaining balance on the original note. Thereafter WTS was obligated to make monthly payments of principal and interest until the maturity date of December 1, 2009, when the entire principal balance plus accrued interest was due and payable if not sooner paid. Interest due included base interest at a fixed rate of 6.25%, calculated on the basis of a 25-year amortization period, plus any amount due under the terms of the Additional Interest Agreement. Payments were applied first to fixed interest, then to principal, and finally to sums due under the Additional Interest Agreement. The original note permitted voluntary prepayment "in full, but not in part", without penalty, upon 30 days' prior written notice to PLI. That prepayment in full would consist of "payment of all sums due under the Loan Documents, including the Additional Interest Agreement."

The original note defined the term "Loan Documents" to include (in addition to the note itself) the security agreement, the loan commitment, and the Additional Interest Agreement. Its terms also included an explicit statement that the relationship between the lender and borrower was solely that of a creditor and debtor, and that nothing in the original note or loan documents should be construed as creating a partnership, joint venture, or other arrangement of co-ownership.

*Modifications of the note*

WTS and PLI modified the original note on four occasions over the course of the loan to extend the disbursement and maturity dates. Each of the modifications treated WTS as the borrower and PLI as the lender. Each of the modifications specified that WTS and petitioners (as the guarantors of WTS's debt) "requested that the Loan and Note be amended as set forth herein, and Lender [PLI] has agreed to do so as provided in this Agreement."

*Security agreement*

Under the security agreement, the debt under the "Loan Documents" (defined therein to include the security agreement, the

**[\*11]** original note, and the Additional Interest Agreement) was secured by the Rome property itself, all leases of it, and all of the profits and proceeds of any sale, conversion, insurance, or taking for public or private use associated with the Rome property. The security agreement included certain covenants that required WTS to obtain prior written consent from PLI before undertaking any of the following with respect to the secured property: making any material alterations, improvements, or additions to it; changing its use; or changing the professional company charged with its management and leasing. Similarly, WTS could not sell or further encumber the secured property without prior written consent from PLI, and WTS was obligated to provide PLI with annual reports consisting of a balance sheet and annual operating statement showing all of WTS's income and expenses.

*Additional Interest Agreement*

Like the original note (and its modifications), the Additional Interest Agreement expressly treated WTS as the "Borrower" and PLI as the "Lender". Under the terms of the Additional Interest Agreement, WTS agreed to pay PLI "Additional Interest" consisting of two items: "NCF ["Net Cash Flow"] Interest" and "Appreciation Interest", payments of which were "in addition to and not in substitution of all Payment Interest and other amounts payable" under the original note and additional loan documents. The agreement separately defined the "lender's percentage" of any payments of additional interest as 50%. The parties to the Additional Interest Agreement agreed that these payments of additional interest were "contingent and uncertain, that the payment of and amount, if any, thereof are speculative in nature and dependent upon a number of contingencies which are not within [PLI]'s control".

Like section 12 of the original note, section 7.4 of the Additional Interest Agreement expressly disclaimed joint-venture status:

> 7.4 Relationship of Lender and Borrower as Creditor and Debtor Only
>
> Lender and Borrower intend that the relationship between them shall be solely that of creditor and debtor. Nothing contained in the Additional Interest Agreement or in any other Loan Document or instrument made in connection with the Loan, including without limitation Lender's right to receive Net Cash Flow Interest and

[*12] Appreciation Interest under this Additional Interest Agreement, shall be deemed or construed to create a partnership, tenancy-in-common, joint tenancy, joint venture or co-ownership by or between Lender and Borrower, or any relationship other than that of creditor and debtor.

As to WTS's debts or losses, section 7.4 provided that PLI "shall not be in any way responsible or liable for the debts, losses, obligations or duties of Borrower with respect to the Property or otherwise."

The Additional Interest Agreement was "effective as of the date that . . . [WTS] accepts the [loan] commitment", which occurred December 6, 2006, more than two weeks before WTS and PLI executed the remaining loan documents. The Additional Interest Agreement remained

in full force and effect until the earlier of: (a) payment of all sums due Lender for Additional Interest hereunder or (b) until such date as this Agreement is terminated by mutual consent of Lender and Borrower. Borrower shall pay lender its Additional Interest realized on account of the Project[7] at any time during the term of this Agreement, whether or not the Loan is funded and whether or not the Project is sold.

As is noted above, the Additional Interest Agreement was one of an integrated set of documents. The original note defined "Loan Documents" to include the Additional Interest Agreement, and "Secured Debt" was defined in the security agreement to include "all principal, interest, *additional interest*, [and] interest at the After-Maturity Rate set forth in the Note." (Emphasis added.)

*PLI's "NCF interest" under the Additional Interest Agreement*

The first item of additional interest that WTS agreed to pay PLI was 50% of net cashflow from the Rome property ("NCF interest"), an

---

[7] The "Project" is not defined in the Additional Interest Agreement, which provides that any terms not defined therein "have the meanings described in the other Loan Documents" (including the loan commitment). The loan commitment designates the specific address of the Rome property as the "Project", which appears consistent with the usage of the term throughout.

**[\*13]** amount calculated after subtracting all expenses[8] from all gross revenues of the property, as computed and paid quarterly. If the NCF calculation for any particular quarter was negative, WTS did not make a quarterly payment to PLI, nor was WTS entitled to make an immediate corresponding deduction or offset to PLI's quarterly NCF interest. However, WTS was obligated to furnish PLI with annual statements showing the NCF calculations, and each year PLI's NCF interest was adjusted on the basis of the annual calculation. Upon this annual reconciliation of prior quarters, any amounts due to PLI (i.e., overdue amounts from previous quarters) incurred additional interest at a rate 2% above the prime rate; and any amounts due from PLI to WTS (as would have resulted from a negative NCF calculation in a previous quarter) would be credited to WTS and accordingly "deducted from the next payment(s) of . . . [PLI]'s NCF [i]nterest due until the credit has been depleted".

*PLI's "appreciation interest" under the Additional Interest Agreement*

The other item of additional interest that the interest agreement required WTS to pay to PLI was so-called "appreciation interest" equal to 50% of the "gross proceeds" derived upon the occurrence of one of seven defined events, "reduced by the sum of the Approved Deductions related to such transaction or event . . . provided that in no event shall Appreciation Interest be less than zero". The "events triggering [WTS's obligation to pay PLI] appreciation interest" were, unless PLI agreed otherwise, (1) sale of the Rome property; (2) recovery of damages or other compensation from a third party in the event of a condemnation or similar circumstance; (3) junior financing in the form of an additional encumbrance being placed on the Rome property; (4) any refinancing of the loan or any portion of the Rome property with a third-party lender, in which case the Additional Interest Agreement remained in full force and effect with respect to the Rome property; (5) default under the loan documents; (6) maturity of the original note; or (7) prepayment of the original note, including "all modifications, renewals and extensions thereof".

The gross proceeds used to calculate the appreciation interest varied depending on the applicable triggering event. In the event of a

---

[8] For purposes of calculating NCF, "all expenses" was defined to exclude income taxes, depreciation, any loan expenses or payments except those made on the loan to PLI, any management compensation or fees in excess of those expected in a reasonable, arms-length arrangement, and any capital improvements to the Rome property.

**[*14]** sale, "gross proceeds" included all of the cash and the fair market value of any non-cash consideration payable to WTS. In the event of a recovery or junior financing, the "gross proceeds" meant all gross proceeds received in any form as a result of that event. In the event of a default, maturity, or prepayment, "gross proceeds" were calculated on the basis of the fair market value of the Rome property in accordance with an appraisal procedure specified in the interest agreement. The interest agreement does not state a definition for "gross proceeds" in the context of a third-party refinance, presumably because the agreement remains in full force and effect until the occurrence of any of the other triggering events defined therein. The agreement defines the approved deductions for the purpose of calculating the appreciation interest differently depending on which of the triggering events applies.

The Additional Interest Agreement also contains the following provision for "Substitute Interest" in certain circumstances:

> If the right to payment of all or part of the Additional Interest shall at any time be held to be invalid by a final judgment of a court of competent jurisdiction or if the method of computation of Additional Interest shall become in the Lender's opinion legally or practically impeded or uncertain or if it becomes impractical in the Lender's opinion to assess damages by virtue of the non-payment by Borrower to Lender of said amounts, as computed above, or in the event of a Default, at the option of the Lender, the Borrower agrees to pay to the Lender in lieu of and not in addition to such Lender's NCF Interest or Lender's Appreciation Interest, interest upon the Note retroactive to the date thereof and until the Note and all indebtedness secured thereby shall be fully paid, in such amount ("Substitute Interest") as is necessary to give the Lender (considering Payment Interest[9] and any Additional Interest, if any, received by the Lender), an effective interest rate per annum equal to (i) the Payment Interest and, added thereto, (ii) interest at the rate of five percent (5%) per annum on the Loan, subject to no offset or deduction, which sum is intended to be additional

---

[9] The interest agreement defines payment interest as "the stated rate of interest payable under the Note for scheduled monthly payments".

[*15] consideration to the Lender for the use of the principal sum advanced to Borrower . . . .

*WTS's operation*

Mr. Barry's company, Spectrum Cauble, was pre-approved in the loan documents to professionally manage the Rome property and was so engaged over the course of the loan. Spectrum Cauble maintained books and records for the rental units, collected rents, and was charged with the responsibility to pursue any tenant defaults under the terms of their leases of commercial spaces at the Rome property. Mr. Barry, acting for WTS, oversaw the renovations, reviewed and agreed to lease extensions, sought out new tenants for the space, and maintained account files. Over the life of the loan, WTS sought and found suitable replacement tenants for both Office Depot and Ferguson Plumbing. PLI was not involved in the management of WTS.

In 2014 WTS determined that the market seemed receptive to a sale of the Rome property; it engaged Collier to solicit offers on the property and negotiated the terms of the purchase.

*Payments to PLI under the loan documents*

From 2008 until the sale of the Rome property in 2014, WTS earned income by renting out the spaces in the Rome property to third parties. Nothing in the record suggests that WTS failed to make payments on the loan in accordance with the loan documents, and no party so contends.

*WTS's tax reporting over the life of the loan*

WTS's tax reporting was consistent with performance in accordance with the terms of the loan, which it characterized as a "nonrecourse liability". From 2006 through 2014, WTS reported the amounts of its outstanding nonrecourse debt and interest expense, net income,[10] and the balances of partners' capital accounts at yearend on its Form 1065, "U.S. Return of Partnership Income", as follows:

---

[10] Most of WTS's net income was rental real estate income, though it also had a small amount of interest income from 2008 through 2014.

16

| [*16] Year | Nonrecourse debt | Interest expense | Income (loss) | Partner capital |
|---|---|---|---|---|
| 2006 | $2,448,651 | $3,956 | ($6,365) | ($6,365) |
| 2007 | 3,613,669 | 218,587 | 56,392 | 10,027 |
| 2008 | 4,377,364 | 302,419 | 61,592 | 31,619 |
| 2009 | 4,298,231 | 311,342 | (84,620) | (93,001) |
| 2010 | 4,214,007 | 266,252 | (39,252) | (132,253) |
| 2011 | 4,124,366 | 260,834 | (30,417) | (162,670) |
| 2012 | 4,028,960 | 2[9]5,069 | 96,250 | (326,420) |
| 2013 | 3,924,424 | 248,847 | 187,335 | (319,085) |
| 2014 | [-0-] | 142,551 | 1,418,427 | 1,099,342 |

For certain years petitioners reported distributions from WTS (reflected in reductions to partner capital, above), as follows: for each of 2007, 2008, and 2009, petitioners reported receiving $20,000 each in distributions; for 2012, petitioners reported receiving $130,000 each in distributions; and for 2013, petitioners reported receiving $90,000 each in distributions. For 2014 petitioners reported receiving $549,671 in distributions—i.e., the balance of the partner capital accounts upon liquidation. We find that WTS's tax reporting was consistent with WTS's stated obligations under the loan documents, including the Additional Interest Agreement.

*Sale of the Rome property*

WTS sold the Rome property in 2014 for $6.3 million. (That sale price included $5,678,204 attributable to the building and $621,796 attributable to improvements.) As part of the sale, WTS paid to PLI $1,035,683 (i.e., 50% of the net proceeds of the sale) as appreciation interest pursuant to the Additional Interest Agreement.

**[\*17]** *WTS's tax reporting of the Rome property sale*

As a result of the sale, WTS reported a gain of $2,647,854 on Form 4797, "Sales of Business Property", attached to its Form 1065 for 2014. On Schedules K–1, "Partner's Share of Income, Deductions, Credits, etc.", of its Form 1065, WTS reported for each partner $1,323,927 of net section 1231 gain on line 10, i.e., his 50% distributive share of the gain from the sale.

WTS claimed a deduction for the $1,035,683 payment it made to PLI in respect of its obligation to pay appreciation interest under the Additional Interest Agreement, but it did not report that payment as part of its itemized "interest" deduction. Rather, on its Form 8825, "Rental Real Estate Income and Expenses of a Partnership or an S Corporation", under its itemized rental real estate expenses, WTS reported this amount with other items in the category "other", and further described it in an attached statement as "interest expense/loan participation by lender".

As a result of passing through WTS's items of income and expense, the Schedules K–1 showed net rental real estate income losses of $614,720 for Mr. Barry and $614,719 for Mr. Deitch. The losses included, in each instance, the partner's 50% share (i.e., $517,842) of the appreciation interest payment ($1,035,683). On their Forms 1040, "U.S. Individual Income Tax Return", for 2014, each petitioner reported his respective shares of WTS's loss as ordinary and WTS's gain as capital, in the amounts reported by WTS on the Schedules K–1.

*NODs and Tax Court petitions*

The IRS examined petitioners' 2014 tax returns. On July 14, 2017, the IRS issued to Mr. and Mrs. Barry an NOD that determined a deficiency of $188,271, and issued to Mr. Deitch an NOD that determined a deficiency of $211,217. In each NOD the attached Form 886–A, "Explanation of Adjustments", contained the following statement with respect to the item of "Net income (loss)" from the rental real estate activities of WTS:

> It is determined that since you did not establish that the
> amount claimed on your return [i.e., WTS's Form 1065] of

**[\*18]** $1,035,683.00[11] was (a) interest expense, and (b) an ordinary and necessary business expense, the amount is not deductible.  Accordingly, *net income* (loss) from rental real estate activities *is increased $1,035,683.00* for tax year ended December 31, 2014.  [Emphasis added.]

For each petitioner the Form 886–A included the following statement passing through to the partner his share of that determination:

> It is determined that your distributive share of the net real estate activity loss from the partnership known as West Town Square investment LLC is ($96,878.00) rather than the ($614,720.00) shown on your tax return.  See Exhibit A for details.  Accordingly, your taxable income is increased $517,842.00 [i.e., the partner's 50% share of WTS's adjustment of $1,035,683] for the year ended December 31, 2014.

Thus, the NODs disallowed deductions for the appreciation interest that had been paid to PLI but made no corresponding reduction to the reported gain from the sale of the property.  (This anomaly has been addressed in the stipulation described below.)

On October 11, 2017, Mr. Deitch and Mr. and Mrs. Barry timely petitioned the Tax Court under section 6213(a) to redetermine the deficiency.

*The Commissioner's position in the stipulation of facts*

Several months before the trial of these cases, the parties filed a Joint Stipulation of Facts in which the Commissioner made a partial concession of the deficiency.  As we noted above, WTS and petitioners had treated as capital gain all the sale proceeds (including the portion that WTS then paid over to PLI as appreciation interest) and had treated the appreciation interest payment as an ordinary deduction.  The NODs had addressed this by simply disallowing the interest deduction but had left the entire gain in income.  In the Stipulation, however, the Commissioner acknowledged that if he is correct that,

---

[11] This adjustment addressed only the appreciation interest, and not the NCF interest or the normal interest on the original note.  Consistent with the NODs, the Commissioner has challenged in this litigation only the appreciation interest, and not the NCF interest that was also paid under the Additional Interest Agreement, nor the normal interest paid under the original note.

[*19] under the terms of the Additional Interest Agreement, the lender PLI acquired an equity interest in the Rome property, then it should follow that therefore "WTS should not have included the $1,035,683 paid over to PLI pursuant to the additional interest agreement in gross income". This position is reflected in the parties' Stipulation 71:

> The parties agree that if the Court determines the Appreciation Payment should be treated as an equity payment (instead of interest expense as originally reported), West Town Square's gross sales of $5,678,204 for the "Sale of Building" should also be reduced by $1,067,467 ($1,035,638 + $31,829).

The parties have stipulated that the only issue for decision is whether WTS properly classified its $1,035,683 payment of so-called "appreciation interest" to PLI as deductible interest.[12] While petitioners take the position that the Additional Interest Agreement was part of the integrated loan documents that created an obligation to pay deductible interest, the Commissioner maintains that, taking into account the Additional Interest Agreement, the documents gave PLI equity in the arrangement, with the result that the payment of the appreciation interest should be treated as an equity payment to PLI. The tax effect of the NODs as issued would have been the complete disallowance of the $1 million interest deduction and a resulting increase in taxable income at ordinary rates; but the tax effect of the Commissioner's revised position would be, as before, the disallowance of the $1 million interest deduction—but partially mitigated by the elimination of capital gain of that same amount.

*The Commissioner's position at trial*

At trial (and in his Pretrial Memorandum and Post-trial Briefs) the Commissioner continued to contend that the amount paid to PLI reduced the capital gain income of WTS (and of its partners, the petitioners) and that the payment to PLI did not constitute the payment of deductible interest. However, whereas previously the Commissioner had contended that the ostensible interest paid to PLI was a nondeductible return on PLI's equity interest in WTS, the Commissioner now refines that position and asserts that the Additional Interest Agreement created a joint venture between WTS and PLI, so

---

[12] If petitioners prevail on this issue, the parties have further stipulated that WTS's interest expense should be increased by $31,829.

**[\*20]** that the ostensible interest paid to PLI was a nondeductible return on PLI's equity interest not in WTS but in the supposed WTS-PLI joint venture.

## OPINION

I.    *Preliminary legal principles*

A.    *Jurisdiction*

1.    *Deficiency jurisdiction*

Under section 6213(a) the Tax Court has jurisdiction over a deficiency case if the IRS issues to the taxpayer a timely notice of deficiency and the taxpayer files a timely petition in the Tax Court. The parties stipulate that these prerequisites have been met in these cases.

2.    *TEFRA jurisdiction*

a.    *Partnership-level proceedings*

However, our jurisdiction to address issues in a deficiency case may be limited. Where the IRS would adjust a taxpayer's "partnership items", as defined in section 6231(a)(3), those items "shall be determined at the partnership level", § 6221(a), under the unified audit and litigation procedures of TEFRA that were in effect for the year at issue. Partnership-level proceedings in the IRS may result in the issuance of a notice of final partnership administrative adjustment ("FPAA"), *see* § 6223(a)(2), (d)(2), which may then be the subject of a so-called "TEFRA case" brought in the Tax Court, *see* § 6226(a)(1), (b)(1). These partnership items cannot be litigated in a deficiency case; and where no FPAA has been issued, the Tax Court "does not have jurisdiction". Rule 240(c).

b.    *WTS as a "small partnership"*

WTS—the entity that passed through to petitioners the loss deductions at issue in these cases—was a partnership for federal income tax purposes, but no partnership-level TEFRA proceedings were undertaken and no FPAA was issued before the issuance of the NODs to petitioners. However, there exists a "small partnership" exception of section 6231(a)(1)(B), which applies where there are "10 or fewer partners each of whom is an individual . . . , a C corporation, or an estate of a deceased partner." Since WTS was owned solely by two

[*21] individuals—Mr. Deitch and Mr. Barry—we conclude that the "small partnership" exception applies to WTS. WTS is therefore not to be treated as a "partnership" for purposes of TEFRA, and we therefore have jurisdiction to redetermine its items in this deficiency case, even if they would otherwise be partnership items. Consequently, to the extent the Commissioner's position (as in the NODs) posits adjustments to WTS's items and corresponding adjustments to the petitioners' returns, we have jurisdiction to entertain that position.

### c. *WTS-PLI joint venture as a TEFRA partnership*

As we explain below, however, the position that the Commissioner advanced at trial (and not in the NODs) posits the existence of an additional entity that, he contends, should be treated as a partnership for federal income tax purposes—i.e., the Commissioner postulates a joint venture between WTS (petitioners' partnership) and PLI (the lender). The Commissioner contends that (for tax purposes) a WTS-PLI joint venture existed (while petitioners contend it did not), and he asks us to determine that the payments at issue that PLI received from WTS were not interest paid on indebtedness but were instead returns on PLI's equity in the postulated WTS-PLI joint venture.

The "partnership items" that fall within the jurisdiction of a TEFRA case—and thus fall outside our deficiency jurisdiction—include the issue of whether a partnership exists; and "in a partnership-level proceeding the Court may determine whether a 'partnership' existed during the year." *Petaluma FX Partners, LLC v. Commissioner*, 131 T.C. 84, 92–93 (2008), *aff'd in part, rev'd in part, vacated and remanded*, 591 F.3d 649 (D.C. Cir. 2010). If a WTS-PLI joint venture did exist as a partnership, the "small partnership" exception could not apply to it because the partners to that joint venture would be a corporation (PLI) and an LLC treated as a partnership for federal income tax purposes (WTS). The "small partnership" exception of section 6231(a)(1)(B) can apply only where each partner is an individual, or a C corporation, or an estate of a deceased petitioner—not another pass-through entity such as WTS. The WTS-PLI joint venture would therefore be a TEFRA partnership; all of the partnership items of that partnership would likewise be outside our deficiency jurisdiction; and, under Rule 240(c), the Tax Court "does not have jurisdiction" in the

[*22] absence of an FPAA.  As we stated in *Jimastowlo Oil, LLC v. Commissioner*, T.C. Memo. 2013-195, at *24:

> The principle . . . that we lack jurisdiction to redetermine affected items attributable to a source partnership before the source partnership-level proceedings have been completed, applies even when the members of the source partnership have failed to recognize that they have created a separate entity (i.e., a partnership) for Federal income tax purposes and have not, therefore, filed a partnership return on its behalf, and the Commissioner has neither conducted a source partnership-level audit nor issued an FPAA to it.

Consequently, to the extent the Commissioner's position posits a WTS-PLI joint venture and alleges distributions by it on account of equity interests, we lack jurisdiction to entertain that position.

In his most recent brief, the Commissioner acknowledges that the preceding analysis is correct, but he also correctly observes:

> [T]he question necessary to determine the question of jurisdiction happens to be the same question at the heart of the case: whether the relationship between WTS and PLI is that of partners in a joint venture, as respondent contends, or borrower and lender, as petitioners contend. If petitioners are right, the Court also has jurisdiction over the substantive issue; if respondent is right, the Court does not have jurisdiction over the substantive issue.  But there is no way to answer the question of jurisdiction without entertaining respondent's argument [as to the asserted WTS-PLI joint venture].

It is a truism that the Tax Court has jurisdiction to determine its jurisdiction.  *U.S. Auto Sales, Inc. v. Commissioner*, 153 T.C. 94, 97 (2019); *Alpha Chem. Partners v. Commissioner*, T.C. Memo. 1995-141, 69 T.C.M. (CCH) 2292, 2292.

Consequently, we can proceed to decide whether there was a WTS-PLI joint venture.  If we were to conclude that there was such a joint venture, then we would lack jurisdiction to adjudicate the issues in the NODs, and (as in *Jimastowlo Oil*) we would have to dismiss the case for lack of jurisdiction.  However, for the reasons explained below, we conclude that there was not such a joint venture, and we proceed to

**[\*23]** decide the issues founded on the NODs, over which we do have jurisdiction.

###### B. *Burden of proof*

The IRS's determination is presumed correct, and taxpayers generally bear the burden to prove incorrect the adjustments made by the IRS in its NOD, whether adjustments to income or to deductions. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Petitioners argue that the burden of proof has shifted to the Commissioner because they have met the requirement of section 7491(a)(1) to "introduce[] credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer". But this is not a case where the evidence presented on any issue is in equipoise; rather, here we find that the preponderance of the evidence resolves the issues in dispute, thereby negating the importance of which party bears the burden of proof. *See Dagres v. Commissioner*, 136 T.C. 263, 279 (2011).

###### C. *Effect of parties' stipulations*

Stipulations are the "bedrock" of Tax Court practice, *see Branerton Corp. v. Commissioner*, 61 T.C. 691, 692 (1974), and we require parties "to stipulate, to the fullest extent to which complete or qualified agreement can or fairly should be reached, all matters not privileged which are relevant to the pending case, regardless of whether such matters involve fact or opinion or the application of law to fact", Rule 91(a)(1). As we have noted above, the parties' stipulations in these cases included the following facts of particular significance:

> 34. The Original Note, Modifications, Security Agreement, and Additional Interest Agreement arose from an arm's length transaction.

> 35. The Original Note, Modifications, and Security Agreement constitute genuine indebtedness by West Town Square to Protective Life.

Such stipulations have a binding effect in the particular proceeding in which the parties enter into those stipulations, in that

> [a] stipulation shall be treated, to the extent of its terms, as a conclusive admission by the parties to the stipulation, unless otherwise permitted by the Court or agreed upon by

**[\*24]** those parties. The Court will not permit a party to a stipulation to qualify, change, or contradict a stipulation in whole or in part, except that it may do so where justice requires.

Rule 91(e). The Court generally enforces stipulations unless "manifest injustice" would result. *Bokum v. Commissioner*, 992 F.2d 1132, 1135–36 (11th Cir. 1993), *aff'g* 94 T.C. 126 (1990); *see also Mathia v. Commissioner*, T.C. Memo. 2007-4, 93 T.C.M. (CCH) 653, 655 (denying the Commissioner's motion for relief from stipulations after he argued that disputed stipulations contained erroneous legal conclusions and stating that "we do not set aside a stipulation of fact that is consistent with the record simply because one party claims the stipulation is erroneous").

No party requests that we grant relief from any stipulation, and none contends that any manifest injustice would otherwise result. We will therefore treat all of the parties' stipulations as conclusive admissions of the terms stated therein.

D. *Formation of a partnership for tax purposes*

Section 761(a) defines a partnership as "includ[ing] a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not . . . a corporation or a trust or estate." *See also* § 7701(a)(2). "Partnership" for tax purposes is generally a more inclusive term than "partnership" at common law, and for tax purposes it may include entities not traditionally considered partnerships. *Dickerson v. Commissioner*, T.C. Memo. 2012-60. "A partnership is generally said to be created when persons join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business and when there is community of interest in the profits and losses." *Commissioner v. Tower*, 327 U.S. 280, 286 (1946). "A partnership is, in other words, an organization for the production of income to which each partner contributes one or both of the ingredients of income—capital or services." *Commissioner v. Culbertson*, 337 U.S. 733, 740 (1949). To decide whether a partnership exists, a court must also analyze the relevant facts to determine whether "the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise". *Id.* at 742.

**[\*25]** Here the Commissioner contends that WTS and PLI formed a "joint venture" that constituted a partnership under section 761(a), and we evaluate that "joint venture" contention "by reference to the same principles that govern the question of whether persons have formed a partnership which is to be accorded recognition for tax purposes". *Luna v. Commissioner*, 42 T.C. 1067, 1077 (1964) (first citing *Estate of Smith v. Commissioner*, 313 F.2d 724 (8th Cir. 1963), *aff'g in part, rev'g in part and remanding* 33 T.C. 465 (1959); and then citing *Beck Chem. Equip. Corp. v. Commissioner*, 27 T.C. 840, 848–49 (1957)). These principles require us to consult

> [t]he following factors, none of which is conclusive . . . : [1] The agreement of the parties and their conduct in executing its terms; [2] the contributions, if any, which each party has made to the venture; [3] the parties' control over income and capital and the right of each to make withdrawals; [4] whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income; [5] whether business was conducted in the joint names of the parties; [6] whether the parties filed Federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers; [7] whether separate books of account were maintained for the venture; and [8] whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise.

*Id.* at 1077–78 (citations omitted).

II.  *Analysis*

A.  *The Commissioner's attempt to thread the needle*

The Commissioner asks us to sustain the disallowance of WTS's deduction of the appreciation interest that WTS paid to PLI after the sale of the Rome property. As we perceive it, articulating an argument in support of this position is made difficult by two considerations:

**[\*26]**  1.  *The relation of the appreciation interest obligation to the stipulated "genuine indebtedness"*

The Commissioner accepts that three of the agreements at issue here—the original note, the modifications, and the security agreement—constitute "genuine indebtedness" by WTS to PLI. But the fourth agreement—the Additional Interest Agreement that gave rise to WTS's obligation to pay appreciation interest—cannot be separated from these other three agreements. Indeed, the four agreements were inextricably integrated with each other. They were simultaneously bargained for, and they cross-reference each other.

WTS's obligation to pay appreciation interest arose from the same advances, totaling $4.4 million, that gave rise to WTS's obligation to pay the other interest components (which are concededly deductible—even the NCF interest that, like appreciation interest, was provided for in the Additional Interest Agreement). There are no other advances that PLI made that could be characterized as giving rise to the obligation to pay appreciation interest.

One might still consider arguing for an allocation of the appreciation interest to a portion of the $4.4 million of advances that should be characterized as equity, but the Commissioner has affirmatively disclaimed that argument, as we now explain.

2.  *The inseparability of the profit sharing and the right to repayment with interest*

Adhering to the position of a General Counsel Memorandum ("G.C.M."), the Commissioner here acknowledges that PLI's "right to share in the partnership's profits" cannot be said to be "separable from its right to repayment of its advance with interest thereon", and acknowledges that it cannot be held "that only the right to share in profits is an equity interest". I.R.S. G.C.M. 36,702 (Apr. 12, 1976), 1976 WL 38976, at \*5. This G.C.M. was issued in response to (and in criticism of) the opinion of the Court of Appeals for the Second Circuit in the case of *Farley Realty Corp. v. Commissioner*, 279 F.2d 701 (2d Cir. 1960), *aff'g* T.C. Memo. 1959-93. Even though this is an argument that the Commissioner disclaims in these cases, we discuss it to explain the reason for the issues that we must decide.

In *Farley* two individuals (*A* and *B*) organized a corporation (*C*) to purchase a building for $380,000. The seller took a first mortgage on the building for $280,000; *A* and *B* financed the remaining $100,000

**[\*27]** with $30,000 cash and the proceeds of a $70,000 loan from another individual (*Z*). *Id.* at 703. *Z* explicitly desired to participate in the venture solely as a creditor. *Id.* The terms of *C*'s second mortgage to *Z* provided that *Z* would advance $70,000 to *C* for ten years in exchange for payments consisting of 15% interest for the first two years and 13% interest thereafter, as well as "50 per cent of the appreciation in the value of the property if it appreciated in value", which was determined at such time that either *C* or *Z* extended an offer to sell or to purchase the other's interest in the property; the $70,000 "principal" was not due until the end of the ten-year term, and repayment of the principal was expressed as "seventy per cent of the first $100,000 of the amount by which the purchase price exceeded the amount outstanding on the first mortgage". *Id.* *C* made payments in accordance with the agreement. Shortly before the principal was due, and when only $583 of interest remained to be paid, *Z* died and his administrators sought to collect the amounts due under the agreement. *Id.* In a state court suit, *C* challenged the enforceability of *Z*'s entitlement to a 50% share in the appreciation, and the parties settled for $120,583, which represented $70,000 in principal, $583 in interest, and $50,000 for *Z*'s share of the appreciation. When *C* filed its tax return, it claimed interest deductions totaling $50,583, and the Commissioner disallowed the $50,000 portion of the interest deduction that corresponded to *Z*'s $50,000 appreciation payment.

The court sustained the disallowance of $50,000 of the interest deductions and held that *Z*'s "right to share in the appreciation of petitioner's property is separable from his right to repayment of his $70,000 loan with interest thereon, and that the right to share in the property's appreciation constituted an equity interest in the property." *Id.* at 704. The court reasoned that *Z*'s entitlement to the appreciation payment, taken separately and apart from the interest of $583, exposed *Z* to downside risk, was of an indefinite amount, and lacked a fixed maturity date, *id.* at 704–05, and therefore was not "interest on an indebtedness". (The court explicitly did not reach the question of whether *Z*'s "equity interest in the property had the features of a 'joint venture'" under relevant state law, *id.* at 706, which is what the Commissioner contends occurred in these cases.)

The position that the IRS has taken on *Farley*—and the position that the Commissioner expressly takes in these cases—is that *Farley* was wrongly decided insofar as it "suggests that the taxpayer's right to share in the partnership's profits is separable from its right to repayment of its advance with interest thereon and that only the right

**[\*28]** to share in profits is an equity interest". G.C.M. 36,702, 1976 WL 38976, at \*5. As the G.C.M. observes, "serious computational problems" would arise with determining that *Z* held an equity interest in *C*, if in fact all of *Z*'s $70,000 contribution constituted a loan. *Id.* at \*6. If his entire contribution was a loan, then *Z* "contributed neither capital nor services in his capacity as a 'partner.' . . . In short the *Farley* decision appears unsound to the extent that it holds that *Z* held an equity interest for which he contributed neither capital nor services". *Id.* at \*5. Fixing this anomaly by separating the loan from the equity interest "might require computing the amount [of the advance] allocable to the loan as a portion of the contribution sufficient to establish the fixed interest as a true, arm's length return and then allocating the remaining portion to equity", *id.* at \*6, an exercise that would involve "difficulty", "mak[ing] this type of allocation undesirable", *id.* at n.3.

We do not attempt here any such allocation between debt and equity because the Commissioner has not argued for it, has disclaimed it,[13] and has not put on any evidence to enable the necessary computations to make the allocation. Therefore, we cannot allocate PLI's $4.4 million advance between a loan and an equity interest.[14] This leaves the Commissioner backed into a corner: If the transaction is entirely debt, then the appreciation interest is deductible interest; but he cannot argue that only a portion of it is equity; so he argues instead that PLI's interest is *all* equity—to wit, its equity share of a WTS-PLI joint venture. Adjudicating that argument would require us to have jurisdiction over partnership issues of such an entity, and we must determine whether such an entity exists.

### B. *Whether WTS established a joint venture with PLI*

The Commissioner contends, notwithstanding the ostensible loan agreement between WTS and PLI—embodied in the four documents that we find to be integrated—that the two entities in fact entered into

---

[13] For example, the Commissioner's Post-trial Answering Brief asserts "that PLI's advance to WTS was . . . not part equity, part debt".

[14] In the absence of stipulations to the contrary and the Commissioner's disclaimer, one might note PLI's practice of advancing 75% of the stabilized value for a conventional loan, versus PLI's practice of increasing the amount to 85% of a projected stabilized value for a participating loan (as is at issue here), and might entertain the possibility that the additional 10% was not bona fide indebtedness but was in fact capital contributed not as part of a loan advance but for a participating profits interest. But this we cannot do, *see* Rule 90(e) and (f), and the Commissioner does not ask us to do so.

[*29] a joint venture. He now argues that the parties' entire agreement created a "relationship between WTS and PLI . . . of joint venturers, not lender and borrower, and that PLI's advance was more in the nature of a capital contribution than a loan." We think that this argument must be rejected if we take at face value the parties' binding stipulation that the original note, the modifications, and the security agreement "constitute genuine indebtedness by West Town Square to Protective Life" and the Commissioner's acknowledgement that "the agreement between WTS and PLI, despite consisting of multiple documents, must be considered as a whole". Whatever else PLI might have been in this arrangement, we know it was a creditor. As we have noted, PLI advanced its entire $4.4 million as proceeds pursuant to those documents. There was no separate or additional advance that did *not* "constitute genuine indebtedness" and that could be characterized as giving rise to WTS's obligation to pay the appreciation interest.

The Commissioner's stipulation of the existence of "genuine indebtedness", and his acceptance that the four loan documents "must be considered as a whole" and that they gave PLI a single interest, contradict the argument he now seeks to advance. Paragraph 35 of the stipulation reflects the parties' agreement that PLI held debt in WTS, and the Commissioner now accepts that PLI's advance created a single interest that must be characterized as either wholly debt or wholly equity. Consequently, the Commissioner's contention that PLI has a single interest properly characterized as equity must fail. The documents created "genuine indebtedness", and this fact precludes a finding that they created no debt but rather a single equity interest in a supposed joint venture.

With the same result, we turn now to a more detailed analysis of the eight "*Luna* factors", which analysis shows that WTS and PLI did not form a joint venture that was a partnership for tax purposes.

1. *The agreement of the parties and their conduct in executing its terms*

The loan documents executed by WTS and PLI could hardly have been more explicit in naming their relationship. Affirmatively, the documents stated that WTS and PLI were borrower and lender. Negatively, the documents expressly stated that WTS and PLI did not form a joint venture. WTS and PLI conducted themselves in accordance with the terms of the loan documents (including the Additional Interest Agreement), and the Commissioner does not contend that any terms of

**[\*30]** the agreement were not followed. This weighs against the existence of a joint venture.

The Commissioner asserts otherwise, stating (with record citations omitted):

> As to the first factor, the agreement between PLI and WTS contemplated the purchase, operation, and eventual sale of a shopping center. . . . A key piece of that agreement was that PLI would share in the potential upside of the investment, both by receiving half of the operating profits but also half of the net proceeds from a sale of the shopping center.

This assertion reflects a misunderstanding of the first factor. It is true that the substance rather than the ostensible form of the transaction controls a determination of the existence of a joint venture, *see WB Acquisition, Inc. & Sub. v. Commissioner*, T.C. Memo. 2011-36, 101 T.C.M. (CCH) 1157, 1164, *aff'd sub nom. DJB Holding Corp. v. Commissioner*, 803 F.3d 1014 (9th Cir. 2015), and that the characterization reflected in a written agreement is not necessarily determinative of whether the parties entered into a joint venture. It may also sometimes be true that a "shar[ing] in the potential upside" is an indication of a possible joint venture, and there is no denying that PLI acquired—apart from its right to receive conventional interest—the right to share in the appreciated value of the shopping center. But that analysis concerns the fourth factor, discussed below. The first factor considers whether the form of the purported agreement is a joint venture and whether the parties departed from the ostensible form. In *W.B. Acquisition* we held, in examining the first factor, that an ostensible joint venture agreement was contradicted by the actual conduct of the parties, so we held that a joint venture had not been created, despite its ostensible form. Here the ostensible form—a series of integrated documents that expressly deny joint venture status and do create "genuine indebtedness"—is debt and not a joint venture, and the parties have operated according to the terms of their agreement. Therefore, the first factor continues to weigh against the existence of a joint venture. (We will proceed to address whether the other factors disclose contrary substance.)

**[\*31]**     2.     *The contributions, if any, which each party has made to the venture*

There is no dispute that WTS contributed the services that made the operation of the Rome property a successful venture, including rehabilitating and maintaining the property and securing the tenants that produced the rental income on the property. The Commissioner argues that PLI's contribution was the capital, indicating that both were members of a joint venture.

However, the advanced funds of a lender are a loan and not a contribution to capital, so it is insufficient for the Commissioner to note the undisputed fact that PLI was the source of money for the project. One must ask in what capacity PLI provided that money; and it is fair for the Commissioner to insist that one must look past PLI's ostensible loan to ask whether perhaps the advances were not really true debt. But the answers to these questions come easily from the Commissioner's stipulation that the indebtedness evidenced by the original note and its modifications—i.e., the entire $4.4 million amount of the funds advanced by PLI to WTS—was "genuine indebtedness". (As we explain below in part II.C, treatment of that amount as genuine indebtedness precludes a finding that PLI had a "single equity interest" that transformed the payments on the indebtedness into guaranteed payments made to a partner of the partnership.)

PLI contributed little of value outside of its capacity as an arm's-length lender of the entire advance to WTS. This factor weighs against finding a joint venture between WTS and PLI. *See DJB Holding Corp. v. Commissioner*, 803 F.3d at 1026 (citing *Luna*, 42 T.C. at 1077–79, and *Culbertson*, 337 U.S. at 742, for the proposition that a purported partner who contributes no value to a joint venture is not a bona fide partner in the venture).

    3.     *The parties' control over income and capital and the right of each to make withdrawals*

Other than the payments that WTS was contractually obligated to make to PLI under the loan documents, WTS controlled the income from the Rome property. PLI was contractually entitled to approximately half of the net income of the Rome property, modified by defining exclusions from "expenses" for purposes of calculating the NCF payment on terms favorable to PLI, whereas WTS was entitled to whatever net income remained after the payments to PLI (which in some

**[\*32]** years resulted in an overall loss). WTS and PLI did not have equivalent interests in the income stream from the Rome property. PLI was always guaranteed to receive what amounted to more than half of the income from the property, provided that the property was profitable. PLI was likewise not liable for any operating losses, except to the extent that they offset the quarterly amounts due to PLI under the NCF calculation at the end of the year.

PLI also exerted control over the primary capital that was the source of the income at issue, under the terms of the interest agreement and otherwise. For instance, if PLI had not repeatedly agreed to extend the term of the original note (which it was permitted, but by no means obligated, to undertake under the terms of the loan documents), PLI could have effectively forced a sale of the property, because all of the principal remaining on the loan would have been due and WTS had few other assets of value beyond the Rome property itself and its income stream, all of which were pledged to PLI as security for the loan. Moreover, the interest agreement became effective before PLI funded the loan; it was a binding contract that governed the parties' conduct "whether or not the Loan is funded and whether or not the Project is sold". Therefore, if WTS had sought junior financing or a full refinance with a different lender during the life of the loan from PLI, or even if WTS had prepaid the full amount of the principal, it would have nonetheless continued to owe PLI appreciation interest, pursuant to Article 4 of the interest agreement, based on the fair market value of the Rome property at the time that WTS exited the deal (and in certain of those instances, would have continued to owe the NCF payments). Any such actions were subject to approval by PLI or were subject to penalty of default, which likewise would not have relieved WTS of its obligation to make the additional interest payments. PLI therefore had significant control over the capital that WTS employed in its business.

PLI's economic interest under the terms of the Additional Interest Agreement, and as demonstrated by the conduct of the parties, resembles that of a holder of a preferred equity interest in the business. *See Estate of Mixon v. United States*, 464 F.2d 394, 410–11 (5th Cir. 1972)[15] (hampering ability to borrow from other creditors at the time the

---

[15] Because petitioners resided in Georgia, venue for any appeal of these cases would, under section 7482(b)(1)(A), be the U.S. Court of Appeals for the Eleventh Circuit. That court has adopted as precedent decisions of the former U.S. Court of Appeals for the Fifth Circuit rendered before October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc). The Fifth and Eleventh

**[\*33]** advance is made, using of funds to acquire capital assets, and the corporation's failure to repay on the due date weigh in favor of finding equity, not debt). Accordingly, this factor weighs in favor of finding that the parties engaged in a joint venture.

> 4.  *Whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income*

As we observed with respect to the third *Luna* factor, WTS and PLI each had an interest in the net profits of the business, but PLI was somewhat shielded from operating losses during the operation of the Rome property. The Commissioner asserts—and we agree—that the entitlement to a share of net profits is generally indicative of an equity interest in the enterprise generating those profits. *See Estate of Mixon*, 464 F.2d at 405; *see also Stevens Bros. & Miller-Hutchinson Co. v. Commissioner*, 24 T.C. 953, 956–57 (1955) (finding advance of capital from one corporation to another in exchange for a one-half share of the profits of the project was a bona fide agreement resulting in half the profits' being taxed as income to each corporation).

However, PLI did not have an obligation to share pro rata in the operating losses from the Rome property. With respect to overall loss on a final disposition of the Rome property, the Commissioner correctly observes that the operation of the Rome property was capitalized almost exclusively with debt and that the assets of WTS that were not pledged as collateral on the loan to PLI were of minimal value; and he plausibly argues that PLI was exposed to a risk of loss. If the Rome property were to decline in value, then PLI would risk losing, to the extent of that decline, the proceeds it had advanced. "Thin capitalization" of an entity is generally a factor favoring a finding that the advance that funds the

---

Circuits evaluate 13 factors in a debt versus equity analysis, of which no single factor is controlling, nor are all factors entitled to equivalent significance. *Estate of Mixon*, 464 F.2d at 402. The Commissioner argues that an analysis of these 13 factors results in the conclusion that PLI's advance was made in respect of an equity interest and not debt, and petitioners urge the opposite. We find that analysis of the *Luna* factors is determinative of the issues in these cases, which require first that we find the existence of the relationship between WTS and PLI that could potentially give rise to an equity interest before we have occasion to characterize that interest.

**[\*34]** venture should be viewed as an equity interest (subject to downside risk). *See Estate of Mixon*, 464 F.2d at 408 (observing that "thin capitalization is very strong evidence of a capital contribution where (1) the debt-to-equity ratio was initially high, (2) the parties realized the likelihood that it would go higher, and (3) substantial portions of these funds were used for the purchase of capital assets and for meeting expenses needed to *commence* operations"). But while it is true that the operation of the Rome property was capitalized almost exclusively with debt, we cannot view this factor in a vacuum. The parties stipulated that the loan from PLI to WTS was genuine indebtedness, and we do not disregard that stipulation to consider whether inadequate capitalization might be a sign of equity rather than debt.

Setting aside the Commissioner's contention with respect to the Rome property's thin capitalization, this factor weighs against finding a joint venture between WTS and PLI, because PLI did not have an obligation to share pro rata in the operating losses from the Rome property. *See WB Acquisition, Inc. & Sub.*, 101 T.C.M. (CCH) at 1167.

### 5. *Whether business was conducted in the joint names of the parties*

The Commissioner concedes that business was conducted in the name of WTS, not PLI or any other entity; and we find that this factor weighs against finding a joint venture.

### 6. *Whether the parties filed federal partnership returns or otherwise represented to the Commissioner or to persons with whom they dealt that they were joint venturers*

The Commissioner concedes that the parties did not file tax returns indicating that they were partners, and that WTS and PLI did not otherwise represent to the IRS or any other persons that they were engaged in a joint venture. Rather, WTS and PLI held themselves out as distinct entities whose relationship was solely that of borrower and lender. This factor weighs against finding that WTS and PLI engaged in a joint venture.

**[\*35]**    7.    *Whether separate books of account were maintained for the venture*

No books of account were maintained for the Rome property other than by WTS. The Commissioner argues that "the parties agreed to the manner in which the books and records of their joint activity would be kept", but this was solely for purposes of calculating the payments due under the interest agreement. WTS and PLI did not jointly maintain books of account that would normally be expected in the operation of a business. *See WB Acquisition, Inc. & Sub.*, 101 T.C.M. (CCH) at 1167. This factor weighs against finding a joint venture.

8.    *Whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise*

While it is clear that PLI exercised control over the capital that it lent to WTS, most of the terms set forth in the security agreement and elsewhere are standard terms present in an arm's-length secured commercial loan, which is consistent with the undisputed evidence that PLI used the same agreements (other than the Additional Interest Agreement) for its conventional loans. WTS exercised primary responsibility and control over the rental operations of the Rome property; and the only involvement PLI had with respect to those operations was its pre-approval of Spectrum Cauble to serve as the commercial property manager. In light of Mr. Barry's involvement with Spectrum Cauble, this pre-approval looks much more like the product of an arm's-length negotiation rather than PLI's exerting responsibility or control over operations. We conclude that this factor weighs against finding that PLI held an equity interest in a joint venture with WTS. *See Luna*, 42 T.C. at 1078–79; *see also Estate of Mixon*, 464 F.2d at 406.

Seven of the eight *Luna* factors weigh against a finding of a joint venture, while one *Luna* factor weighs in favor. We find particularly significant the absence of any contribution by PLI to the purported joint venture, where the parties have stipulated that all of the funds it advanced to WTS were genuine indebtedness. Under the holding of *Culbertson*, 337 U.S. at 740, to the extent a partner must contribute "one or both of the ingredients of income—capital or services", we find no basis to conclude that PLI made a contribution to an organization with WTS for the production of income. Viewing the transaction as a whole, and in light of our findings on all of the *Luna* factors, with no one factor

**[\*36]** being conclusive, we hold that there was no joint venture between WTS and PLI.

  C. *Whether on other grounds the appreciation interest constituted a return on equity*

  The fact that there was no WTS-PLI joint venture forecloses the argument that the Commissioner advanced in his Pretrial Memorandum and his Post-trial Briefs. It does not directly address the position in the NOD, which does not posit a WTS-PLI joint venture. To determine whether we need to address the NOD apart from the joint venture contention, we ordered the Commissioner to answer this question:

> If we conclude that we lack jurisdiction to entertain the Commissioner's [joint venture] argument . . . , what issues remain to be decided in the case in light of the parties' stipulations? See Doc. 10, stip. paras. 13, 15, 24, 27, 32-35, 68.

The Commissioner responded:

> [T]he issues revolve around what are properly partnership issues of a joint venture between WTS and PLI. Because the Court has no jurisdiction over partnership items in a deficiency proceeding, if the Court finds that the WTS and PLI are joint venturers, there are no issues remaining for the Court to decide.

Thus, he did not explicitly state what issues remain to be decided if we hold there was *not* a WTS-PLI joint venture. He does not say whether we should decide the issue as framed in the NOD, apart from the existence of a joint venture. Rather than deeming that position waived or abandoned, we address it.

  In his opening brief filed after trial, the Commissioner summarizes his operative contention thus: "When all of the facts are considered, the Court should conclude that the advances made by PLI to WTS were equity, not debt." As we have said, we conclude that this argument is foreclosed by the stipulated fact of "genuine indebtedness".

  The Commissioner nonetheless urges, despite this stipulation, that we characterize as equity not just a portion of PLI's loan but the entire advance. This position avoids the necessity of an allocation

**[*37]** between debt and equity (which, rejecting *Farley* and following the G.C.M., he has disclaimed). However, if successful, this argument that PLI's entire advance was equity would contradict his concession that WTS was entitled to deduct as interest the regular interest and the NCF interest. To attempt to cure this contradiction, he argues that the interest payments that WTS made pursuant to the original note should be treated as "guaranteed payments" to a partner pursuant to section 707(c),[16] which provides:

> To the extent determined without regard to the income of the partnership, payments to a partner for . . . the use of capital shall be considered as made to one who is not a member of the partnership, *but only for the purposes of section 61(a) (relating to gross income) and, subject to section 263, for purposes of section 162(a) (relating to trade or business expenses).* [Emphasis added.]

Section 707(c) thus creates a narrow exception to allow a payment by a partnership to "be considered as made to one who is not a member of the partnership",[17] and by the text emphasized above it limits the effect of that exception to only the explicit Code sections cross-referenced therein. "For the purposes of other provisions of the internal revenue laws, guaranteed payments are regarded as a partner's distributive share of ordinary income." Treas. Reg. § 1.707-1(c). Accordingly, the Commissioner urges that treatment of PLI's advance of the loan funds as part of a single equity interest—

> would have the same tax results to WTS and PLI for payments made pursuant to the promissory note [i.e., the regular interest] as though it were a traditional loan, with the payments deductible to WTS (as guaranteed payments

---

[16] In making the argument under section 707(c), the Commissioner follows here the G.C.M., which states: "Application of Code § 707(c) would thus permit the entire interest to be characterized as equity, while at the same time recognizing that the holder of that interest is receiving some payments as a creditor." G.C.M. 36,702, 1976 WL 38976, at *6. By this approach, the "problems of allocation can be avoided by finding that the taxpayer holds only a single interest rather than separable debt and equity interests. Such a finding does not preclude recognizing that a single interest may have elements of both debt and equity." *Id.* This analysis posits an "entire interest . . . characterized as equity" but with "elements of both debt and equity." *Id.*

[17] We observe that Congress used wording here different from that in section 707(a), which is implicated "[i]f a partner engages in a transaction with a partnership other than *in his capacity as a member* of such partnership." (Emphasis added.)

**[\*38]** or interest) and includable in income for PLI as interest. Only the payments [of appreciation interest] made pursuant to the additional interest agreement—such as the payment of a portion of the proceeds from the sale of the shopping center at issue here [which payments are made with "regard to the income of the partnership", i.e., from the sale of the shopping center]—would be treated differently.

We see two immediate problems with the Commissioner's argument. First, the text of this subsection requires, as a definitional prerequisite to its applicability, that the transfer be made by a partnership to a partner of that partnership. In other words, payments made by any person other than a partnership or payments made to any person other than a partner of that partnership cannot be "guaranteed payments" under section 707(c). Therefore the Commissioner's argument is impossible if we reject (as we do) his positing of a WTS-PLI joint venture. Section 707(c), if it applied, might cure the contradiction and save the deductibility of the regular interest and the NCF interest, but we cannot tell whether the Commissioner intended that this section 707(c) analysis be applied as between WTS and PLI (without the joint venture). If he did, then the analysis founders on the stipulated fact that PLI did not own a membership interest in WTS (and was therefore not a partner of the partnership WTS). The only payments at issue are those that were made from the partnership WTS to the non-partner PLI. The payment of appreciation interest was therefore not a "payment[] to a partner" under section 707(c).

Second, as we have frequently noted, the Commissioner has also stipulated that the advance at issue was "genuine indebtedness" that WTS owed to PLI. Though a partner may indeed make a bona fide loan to a partnership of which he is a partner, such an arm's-length transaction properly results in treating the loan as one made by the partner in a non-partner capacity under section 707(a), rather than as a guaranteed payment for the use of capital pursuant to section 707(c). *See Pratt v. Commissioner*, 550 F.2d 1023, 1027 (5th Cir. 1977) ("since there is no dispute in this case that the taxpayers' loans to their partnerships were bona fide loans, the loan transactions are to be treated under § 1.707-1(a) of the Treasury Regulations, as coming within the provisions of § 707(a) and . . . the interest accrued on such loans therefore does not constitute a 'guaranteed payment' under § 707(c)"), *aff'g in part, rev'g in part, and remanding* 64 T.C. 203 (1975); *Gaines v. Commissioner*, T.C. Memo. 1982-731, 45 T.C.M. (CCH) 363, 374 n.15

[*39] ("Transactions between a partner and his partnership when the partner is not acting in his capacity as a partner are governed by section 707(a), not section 707(c)"); *see also* Treas. Reg. § 1.707-1(a) ("Such transactions [under section 707(a)] include, for example, loans of money or property by the partnership to the partner or by the partner to the partnership . . . . [T]ransfers of money or property by a partner to a partnership as contributions . . . are not transactions included within the provisions of this section"); G.C.M. 36,702, 1976 WL 38976, at *7 ("deductions under Code § 163 require a true indebtedness which by definition is not present when Code § 707(c) applies"). Therefore, contrary to the Commissioner's brief quoted above, a partnership's payments "to a partner for . . . the use of capital" (to which section 707(c) would apply) are not equivalent to such payments made to a partner "other than in his capacity as a member of such partnership" in respect of genuine indebtedness (to which section 707(a) would apply).

We therefore hold that PLI did not have a "single equity interest" in its dealings with WTS that transformed WTS's loan payments on genuine indebtedness to PLI into guaranteed payments made to a partner pursuant to section 707(c) or into something else.

D.     *Whether WTS's payment of appreciation interest to PLI was deductible interest pursuant to section 163(a)*

Section 163(a) provides the "general rule" that "[t]here shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness". This general rule is subject to a number of limitations imposed by the remaining paragraphs of section 163, including a general prohibition against deductions for "personal interest", *see* § 163(h), but neither party contends that any of these limitations apply here. Rather, the Commissioner contends that the appreciation interest payment was not interest, as petitioners have asserted.

The Supreme Court has defined "interest on indebtedness" as "compensation for the use or forbearance of money". *Deputy v. du Pont*, 308 U.S. 488, 498 (1940); *see also Old Colony R.R. Co. v. Commissioner*, 284 U.S. 552, 560 (1932) ("the usual import of the term [i.e., "interest"] is the amount which one has contracted to pay for the use of borrowed money"). We therefore must decide whether, in light of the other holdings in this Opinion, WTS's payment of the appreciation interest to PLI was compensation for the use of the funds that PLI advanced to WTS.

[*40] Petitioners cite a number of precedents in support of their argument that the appreciation interest was "interest" within the meaning of section 163. In the case of *Kena, Inc. v. Commissioner*, 44 B.T.A. 217, 218 (1941), the Board of Tax Appeals (predecessor to the Tax Court) held that a payment of "money in lieu of interest" calculated as 80% of the net profits of the borrowing corporation for the duration of the loan, was in fact interest. So holding, it stated that "[i]t is not essential that interest be computed at a stated rate, but only that a sum definitely ascertainable shall be paid for the use of borrowed money, pursuant to the agreement of the lender and borrower." *Id.* at 221. Since that decision, the IRS has issued guidance concluding that sums calculated at other than a fixed rate may also constitute interest, including such sums calculated in addition to a fixed rate of interest. *See* Rev. Rul. 83-51, 1983-1 C.B. 48, 48–49 (concluding that home mortgage interest composed of 12% fixed interest plus 40% of the appreciation of the home during the period of the loan was "interest" under section 163); Rev. Rul. 76-413, 1976-2 C.B. 213, 213–14 (concluding that a real estate loan that charged fixed interest at 11% plus contingent interest calculated as "the greater of 1.75 percent of the gross receipts or $300 per acre from the sale of portions of the property" qualified as mortgage interest).

The parties have stipulated that the full amount of the funds advanced by PLI was advanced pursuant to documents that "constituted genuine indebtedness", and we have concluded above that WTS and PLI were not engaged in a joint venture or another arrangement that could give rise to an equity interest entitling PLI to any portion of the payments at issue. Rather, WTS was obligated to pay the additional interest because WTS entered into the loan transaction structured by a series of interdependent contracts governing the terms of its indebtedness to PLI. We therefore conclude that WTS paid the appreciation interest as compensation to PLI for the use of the funds advanced, and that the appreciation interest was "interest" within the meaning of section 163.

*Conclusion*

WTS's payment to PLI of the appreciation interest was a deductible payment of interest and not a payment in respect of equity.

*Decisions will be entered for petitioners.*